# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-01261-SCT

*GERALD W. SCAFIDI, WHEEL-IN PARK AND CAMPGROUNDS, INC., A MISSISSIPPI CORPORATION, WHEEL-INN TRAILER PARK, INC., A MISSISSIPPI CORPORATION, AND SCAFIDI'S WHEEL-INN RESTAURANT, INC., A MISSISSIPPI CORPORATION*

*v.*

*JO ANN S. HILLE*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/17/2013 |
| TRIAL JUDGE: | HON. MICHAEL H. WARD |
| TRIAL COURT ATTORNEYS: | NATHAN S. FARMER |
| | THOMAS WRIGHT TEEL |
| | ALFRED R. KOENENN |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | NATHAN S. FARMER |
| ATTORNEYS FOR APPELLEE: | ALFRED R. KOENENN |
| | THOMAS WRIGHT TEEL |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY - CORPORATION |
| DISPOSITION: | AFFIRMED - 12/10/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1. This case involves a dispute between Gerald W. Scafidi ("Gerald") and his sister, Jo Ann S. Hille ("Jo Ann"), about three family corporations and the land they inherited from their parents. Unable to get along, each sibling ran one of the corporations essentially as a sole proprietorship, while the third corporation ceased to do business. The sister, dissatisfied

with the deadlock, brought this suit to end her business dealings with her brother and divide the assets.

¶2.    The chancellor found that the parties had failed to observe corporate formalities, so they were not entitled to the protections of the corporate form. The chancellor made an equitable distribution and granted each party full ownership of separate companies and then adjusted the property lines to grant each sibling a fifty-percent interest in the land. One corporation that could not be divided was sold by agreed order and the proceeds of the sale were divided between the siblings. Other parts of the ruling addressed attorney's fees, expert fees, unpaid taxes, the BP settlement, and other matters. Gerald appeals. In short, he argues that the chancellor erred by not following the statutory framework for dissolving and distributing corporate assets according to stated ownership interests. Had the assets been distributed in proportion to ownership, he would have received a larger distribution as the majority shareholder. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

### A.    Background

¶3.    This case presents a tangled factual and procedural history between two siblings and a chancellor's effort to resolve their dispute. August J. Scafidi and Audrey Scafidi were married and had three children: Gerald, Jo Ann, and August Jr. (deceased). During the 1950s, the parents purchased all of the subject property. Later, the parents divided the property and titled two parcels in separate family-owned companies and titled one parcel as tenants in common. All of the property is situated along the south side of Highway 90 in Bay St. Louis,

2

Mississippi. In 1994 the father died, and the mother passed away four years later. The parents set out in their wills that Jo Ann and Gerald should share equally in their estates. A map of the properties is attached as an exhibit.

¶4.    After the death of their parents, Jo Ann and Gerald resumed operations of the businesses. They had two corporate meetings in 1998, but they did not reach any agreements or record any minutes. These were the only corporate meetings the brother and sister had over the next decade, despite Jo Ann's requests and efforts.[1] Jo Ann stayed on the eastern parcel and ran the Wheel-Inn Trailer Park ("the Trailer Park"), while Gerald remained on the western parcel and ran Scafidi's Wheel-Inn Restaurant ("the Restaurant") and the Wheel-Inn Park & Campground ("the Campground"). Their arrangement was informal, without any documentation. Both brother and sister expressed concerns about the way the other managed the properties and the businesses. This was the status quo from the time their parents died until the commencement of Jo Ann's suit in 2006.

B.    Properties at Issue

1.    *Wheel Inn Restaurant, Inc. (Gerald's Business)*

¶5.    When August Sr. died, he left Scafidi's Wheel-Inn Restaurant to his wife. When Audrey died, she left forty-five-percent of the shares to Jo Ann, forty-five-percent of the shares to Gerald, and ten percent of the shares to her grandchildren (August Jr.'s children, who are the nieces and nephews of Jo Ann and Gerald). The Restaurant owned the 0.92-acre

---

[1] This is not to suggest that Gerald and Jo Ann had zero contact. For example, evidently at the request of Gerald, Gerald and Jo Ann executed a note in the amount of $250,000 on September 19, 2003. The note was reduced to $150,000 by the sale of the land jointly owned by the siblings with the balance paid by Gerald.

parcel of land on which it was located and was solely operated by Gerald. Gerald did not consult Jo Ann in the decisions he made regarding the Restaurant undertaking. The Restaurant building had not been rented out since early 2006, when its last tenant vacated. Since then, it has been in a general state of disrepair. In the four to five years before trial, and without Jo Ann's consent or participation, Gerald used funds from the Campground corporation and another rental account, both controlled by Gerald, to pay for repairs, furnishings, and fixtures to reopen the Restaurant on a partial basis.[2]

¶6. Co-located with the Restaurant, but separate from the Restaurant operation, was a rented-out space known as the Latino Shop. Before his death, August Sr. built this tiny space adjacent to the Restaurant for Jo Ann's beauty salon. The parents set out in their wills that Jo Ann could lease this space for one dollar a year. After a series of ventures, Jo Ann rented this space for a business referred to as the Latino Shop.[3]

### 2. Wheel Inn Park & Campgrounds, Inc. (Gerald's Business)

¶7. The Campground is located on the largest parcel of land (approximately 9.3 acres), situated behind the Restaurant property, and it also was controlled exclusively by Gerald. Jo Ann and Gerald each received a fifty-percent ownership interest in the Campground

---

[2] There was also an order entered by the chancellor in 2009 for the parties to operate in the status quo in the normal course of business until further order of the court.

[3] After the beauty shop, Jo Ann opened a business in the rental space, known as Heaven, to generate income. Jo Ann supplemented the Heaven business with funds from the Trailer Park corporation. Heaven went out of business shortly before Hurricane Katrina hit. After Heaven closed, Jo Ann planned on using that rental space for her daughter's business, a 1950s Diner, but that business fell through. After Heaven closed, the Latino Shop moved in. Jo Ann placed money from the Latino Shop into the Trailer Park corporation.

4

corporation. The Campground does not own the parcel on which it is situated. Jo Ann and Gerald each own an undivided one-half interest in the Campground property as tenants in common, as conveyed to them by their mother. Like the Restaurant, Gerald operated and controlled the Campground without consulting Jo Ann. The Campground operation consisted of a seventy-five-pad RV park, a swimming pool, five rental cabins, and several tent sites. Out of the three family businesses, the Campground was the most profitable. Using Campground monies, Gerald paid off his personal credit card, paid for utility and phone bills, and bought a truck. Gerald lived on the second floor of a two-story building located on the Campground property. The first floor included a laundry facility, a small convenience store, restrooms and showers, and ice and propane sales.

¶8.     Gerald also used the Campground property for the rental of heavy equipment owned by him or his friends. Gerald used this same equipment to maintain and repair the Campground, the Restaurant, and, to some degree, the Trailer Park properties. Gerald sometimes used income from this offsite work for the benefit of the Campground and the Restaurant. However, Gerald did not pay rent for the equipment operation to the Campground or to Jo Ann, as the one-half owner of the Campground land.

¶9.     Finally, Gerald rented out a small building on the property known as the "Lunch Box," which he used to pay for various expenses of the Campground and Restaurant operations. Rental income from the Lunch Box was deposited into an account at People's Bank, which Gerald controlled and maintained to the exclusion of Jo Ann. For one year in 2000, Gerald correctly split the rental income with Jo Ann, but then he stopped in 2001. He refused to

divide the income from the rental account and concealed all details from Jo Ann and even his accountant.

### 3. *Wheel Inn Trailer Park, Inc. (Jo Ann's Business)*

¶10. Jo Ann operated the Trailer Park, which included the second largest parcel of land (approximately 3.61 acres). Jo Ann did not consult Gerald in running the business. Jo Ann and Gerald each owned a forty-percent interest in the Trailer Park, and their nieces and nephews owned the remaining twenty-percent. The Trailer Park rented out spaces for mobile homes, usually on a long-term basis. Jo Ann drew income from the Trailer Park and also used funds from the Trailer Park to operate her side businesses on the Restaurant property. Jo Ann also used funds from the Trailer Park to repair the roof on her house and to pay for her health insurance and a car.

### C. *Summary of Events Before and During Litigation*

¶11. Despite Jo Ann's efforts, she could never get Gerald and the other minority shareholders to a corporate meeting after 1998. Jo Ann often tried, with no success, to talk to Gerald about the businesses and financial accounts. This often resulted in unpleasant exchanges. Jo Ann's last attempt to have a corporate meeting came after Hurricane Katrina. When Gerald stated the only way Jo Ann could get him to a meeting was by suing him, Jo Ann retained counsel and filed suit.

¶12. Jo Ann filed her complaint in August 2006 in the Hancock County Chancery Court. She requested that the chancery court order an accounting, compel a shareholders' meeting for the purposes of dissolution, and, alternatively, partition the property. She amended her

complaint in August 2007 to add as defendants the minority shareholders in the Trailer Park and the Restaurant corporations, as well as a lienholder, the Peoples Bank.

¶13.    In August 2008, after attempting mediation, Gerald purchased the minority shares in the Restaurant and the Trailer Park for $180,000. Gerald asserted this money came from the funds of other individuals, and not monies from the Campground or Restaurant, in which Jo Ann had an equal interest. After Gerald purchased the minority shares, Gerald and Jo Ann held the following interests in the three corporations: the Trailer Park, Gerald sixty-percent and Jo Ann forty-percent; the Restaurant, Gerald fifty-five-percent and Jo Ann forty-five-percent; and the Campground, Jo Ann fifty-percent and Gerald fifty-percent.

¶14.    Gerald then called for a stockholder's meeting to remove Jo Ann from the boards of the Restaurant and the Trailer Park corporations, so she could no longer act on their behalf. In response, Jo Ann sought a preliminary injunction to stop the meeting. In November 2008 after a hearing on the minority shareholders' cross-motion to dismiss, the chancellor dismissed the minority shareholders as defendants when it was disclosed that Gerald had purchased their stock.

¶15.    In December 2009, the chancellor ordered the parties to maintain the status quo regarding the corporate/business operations until he could hear and decide the matter. "[N]o person or company should make expenditures from operations on the properties or in the companies that are not in the interest of the companies and which are not reasonable and necessary to that company; further there shall be no waste of the corporate assets or income."

7

The chancellor also found it was necessary to order a forensic accounting of the income and expenditures of each party over the past decade.

### D. The Trial and the Chancellor's Final Amended Judgment

¶16. The case was tried over a period of four days: on August 29 and 30, 2011, and on February 8 and 9, 2012. Jo Ann amended her complaint a second time in October 2011 to add a claim for a partition in kind of the properties. In response, Gerald elected to purchase Jo Ann's shares under the dissolution statute Section 79-4-14.34 of the Mississippi Code, which the chancellor denied.

¶17. The chancellor appointed Alexander, Van Loon, Sloan, and Farve ("AVL"), to conduct the forensic accounting. Kim Marmalich testified as the expert forensic accountant. Marmalich noted that all three corporations were closely held. She stated Jo Ann filed personal tax returns, but that Gerald had not filed since 2004. She also testified Gerald's books were unclear and there was not enough information to determine Gerald's income or the monies he made on the Campground and the Restaurant properties. The AVL report showed that the operation and management of the corporations under the control of Gerald and Jo Ann revealed a commingling of revenue and expenses. The chancellor admitted the report into evidence as a trial exhibit. Shelley Ray, an accountant with the Rigby CPA Firm, also testified about these accounting problems. She had done accounting work for Gerald and Jo Ann in the past for the corporations. She stated Jo Ann had provided bank statements and verifying receipts, but that Gerald gave only receipts for cash payments.

8

¶18.    After being qualified as an expert, Harry Hebert, an appraiser hired by Jo Ann, gave testimony as to the value of the Restaurant, the Trailer Park, and the Campground properties. Mike Cassady, a surveyor also hired by Jo Ann, also testified and put forth several versions of a proposed division of the Scafidi properties.

¶19.    Gerald testified that the funds he used to purchase the minority shareholders' shares for the total cash consideration of $180,000 came from his personal funds and the funds from five other individuals. Two of these individuals testified at trial, though they offered very little documentation.

¶20.    On January 17, 2013, the chancellor entered a Final Judgment. In his finding, the chancellor stated that Gerald was "less than forthcoming to the point of being secretive and non-responsive to discovery requests regarding all financial matters, specifically including the income and expenses of the restaurant, campgrounds, or rental account."

¶21.    In addition to Gerald's failure to respond to discovery, the chancellor found "that the appointment of a forensic accountant was necessitated by the failure of Gerald to maintain even minimally acceptable books and records . . . ."[4] The chancellor noted that, although "the forensic accounting . . . experts attempted to do their job," he found "that the methods used by the forensic accountants [could] not be reliably applied to the facts of this case to establish the amount of misappropriation of money by Gerald."

---

[4]The chancellor further found "that if Gerald had truthfully responded to discovery and maintained accurate books and records . . . then it would not have been necessary to engage a forensic accountant . . . . [T]he work of the forensic accountant was hampered, delayed and made more expensive by Gerald's failure to . . . cooperate fully with the forensic accountant."

¶22. The chancellor then found that Gerald's purchase of the minority shares in the Restaurant and the Trailer Park corporations "was an attempt to acquire absolute control . . . to the detriment and oppression of Jo Ann, as a minority shareholder." The chancellor did not find Gerald or his witnesses' testimony credible as to the source of the $180,000. Then, the chancellor found that "the only source of funds available to him was from the restaurant and campgrounds corporations together with unreported income diverted from them in which Jo Ann and Gerald had an equal interest. Effectively, the other shares were therefore purchased with funds equitably owned by both Jo Ann and Gerald." As a result of this finding, the chancellor equitably resolved the interests of Jo Ann and Gerald by disregarding the shares purchased by Gerald. The Court considered Jo Ann and Gerald to be equal shareholders in the Restaurant and the Trailer Park.

¶23. After finding that Jo Ann and Gerald each held an equal interest in the corporations, the chancellor reasoned that since "the parties treated the companies . . . informally," he could "divide the assets and equities in a simpler manner." He also ordered that the property lines be modified based on the revised survey so that Jo Ann and Gerald each owned approximately fifty percent of the real property at issue. In equalizing Gerald's and Jo Ann's interest in the land and corporations, the chancellor ruled:

> 5. ORDERED AND ADJUDGED, that the Court *divides*, *partites*, and *equitably separates the parties by granting each full ownership of separate companies* and then *adjusting the property lines* to accommodate the findings of this court; therefore,
> A.    The Court does hereby order that the remaining property shall be divided in accordance with [the appraiser's] recommendations and the revised survey . . . .

10

> B. The Court finds that *Jo Ann* shall be the owner of the . . . *Trailer Park* . . . together with all personal property on that property as expanded by the revised . . . survey which includes part of the campground property;
>
> C. The Court finds that *Gerald* shall be the owner of the . . . *Campground* . . . together with all personal property on that property as reduced by the . . . survey;
>
> . . .
>
> E. The Court hereby orders that each of the parties is to execute the necessary documents, including deeds, bills of sale and stock certificates to accomplish the directions of this court.
>
> 6. ORDERED AND ADJUDGED, that the *restaurant* building, including the Latino shop, shall be *sold* together with all personal property on site . . . .

(Emphasis added.)

¶24. According to the chancellor, "the actions of Gerald . . . were the cause of the length and costs of this litigation," so the chancellor equitably divided the costs, awarding Jo Ann a percentage of her attorney's fees, fees for forensic accounting, and fees for the appraiser and the surveyor.

¶25. On April 8, 2013, the chancellor entered a Corrected Judgement, *nunc pro tunc* to January 17, 2013. The chancellor entered Final Judgment on April 25, 2013, *nunc pro tunc* to January 17, 2013, responsive to the parties' post-trial motions to alter/amend the judgment, for the sole purpose of correcting and amending certain clerical errors, including the survey line dividing the Trailer Park and the Campground properties. The chancellor ordered that the survey line be adjusted to comport with the court's decision to equalize the parties' interest in the properties. That same day, the chancery court entered an agreed order that the Restaurant building and land be sold.[5]

---

[5] The chancery court entered an order on July 19, 2013, approving the sale of the Restaurant property. The tract sold for $385,000, resulting in net proceeds of $313,765.59, which were divided under the chancellor's orders entered in these proceedings.

11

¶26.     Gerald then filed a Notice of Appeal with this Court on May 24, 2013. On February 6, 2014, the chancellor entered an order on pending post-trial motions, recognizing that the partition line referenced in the Final Judgment was in error, but that he did not have jurisdiction to modify it because of the appeal to this Court. After the last post-trial order, the chancellor entered his Order of Recusal on March 6, 2014, as Gerald had filed suit against the chancellor in federal court. On March 12, 2014, by order of the Mississippi Supreme Court, a special judge was appointed.[6]

¶27.     On April 7, 2014, Gerald, under Mississippi Rule of Civil Procedure 60(b), filed a Motion Seeking Relief from Final Judgment. This Court dismissed Gerald's appeal and remanded the case to the Chancery Court of Hancock for further hearings on motions. Then, Gerald filed his Supplemental Motion to Amend/Alter the Judgment, for New Trial, for JNOV, and to Supplement the Record. The special chancellor entered an Amended Final Judgment on May 12, 2014, to correct a calculation error. On June 4, 2014, this Court denied Gerald's Petition for Permission for Interlocutory Appeal and Stay of Proceedings in the Lower Court. Gerald appealed. Because of the many issues in this case, we will discuss the facts relevant to each issue below.

**DISCUSSION**

¶28.     The issues raised by Gerald in this appeal fall into seven categories: (1) Whether Jo Ann lacked standing to bring derivative claims in the name of the corporate parties; (2)

---

[6] To avoid confusion, when this Opinion refers to the "chancellor" this refers to the original chancellor, Jim Persons, and the subsequently appointed special chancellor, retired Harrison County Judge Michael H. Ward.

whether the chancellor committed error by granting relief beyond the scope of claims asserted by Jo Ann; consolidated with (3) whether the chancellor committed error by granting relief as to the divestment, division, and distribution of the assets of the corporate parties, outside the process of the corporate dissolution statutes; (4) whether the chancellor lacked authority to order partition in kind or partition by sale of real property held solely in the names of the corporate parties; (5) whether the chancellor committed error by divesting Gerald of his separate interest in the Trailer Park; consolidated with (6) whether the chancellor committed error by granting partition in kind between Jo Ann and Gerald without: (A) consideration of an accurate, up-to-date valuation of the remaining real properties, (B) without a consideration of the exclusive use or occupancy of subject real properties by Jo Ann and Gerald, (C) without granting an access easement to Gerald for ingress and egress, and (D) without consideration of Jo Ann's acquisition of the one-half interest of Gerald in the Imbronone property; and (7) whether the chancellor committed error by not allowing the parties a fair opportunity to respond to the *sua sponte* exclusion of the AVL Forensic Accounting Report from evidence after the close of the record.

### Standard of Review

¶29.    This Court reviews a chancellor's decision for an abuse of discretion. We will not disturb a chancellor's factual findings "when supported by substantial evidence unless . . . the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard." ***Venture Sales, LLC v. Perkins***, 86 So. 3d 910, 913 (Miss. 2012).

13

A chancellor's decision will be affirmed when it is supported by substantial credible evidence. *Id.* Questions of law are reviewed *de novo*. *Id.*

## I. Whether Jo Ann lack standing to bring derivative claims in the name of the corporate parties.

¶30. Gerald argues that Jo Ann's claims are derivative in nature and that she lacked standing to bring a derivative claim in the name of the corporate parties, because she failed to make a written demand on the corporation as required by Section 79-4-7.42 of the Mississippi Code. See Miss. Code Ann. § 79-4-7.42 (Rev. 2013). Gerald also argues that, even if the trial court could treat Jo Ann's derivative action as a direct action against Gerald, the chancellor should have made a finding under *Derouen v. Murray*, 604 So. 2d 1086, 1091 n.2 (Miss. 1992), that her direct action would not: (1) unfairly expose the corporation or the defendants to a multiplicity of actions, (2) materially prejudice the interests of creditors of the corporation, or (3) interfere with a fair distribution of the recovery among all interested persons.

### A. Written Demand Requirement

¶31. In general, "an action to redress injuries to a corporation . . . cannot be maintained by a stockholder in his own name, but must be brought by the corporation because the action belongs to the corporation and not the individual stockholders whose rights are merely derivative." *Longanecker v. Diamondhead Country Club*, 760 So. 2d 764, 768 (Miss. 2000). A shareholder may not file a derivative action until "[a] written demand has been made upon the corporation . . . ." Miss. Code Ann. § 79-4-7.42 (Rev. 2013).

14

¶32.    Although Mississippi "law impresses upon derivative actions certain pre-trial procedural requisites over and above the norm," *Derouen*, 604 So. 2d at 1091, precedent supports excusing the written-demand requirement in a closely held corporation. In *Derouen*, this Court stated in a footnote that Mississippi follows the view of the *Principles of Corporate Governance* § 701(d):

> (d) In the case of a *closely held corporation . . .* , the [chancery] court in its *discretion* may treat an action raising derivative claims as a *direct action*, *exempt* it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, *if* it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

*Derouen*, 604 So. 2d at 1091 n.2. (emphasis added).

¶33.    "The principal effect of [treating a derivative action as a direct action]," the Court stated, "would be to exempt [the] plaintiff from these procedural hoops [such as demand]." *Derouen*, 604 So. 2d at 1091 n.2; *Principles of Corporate Governance* § 701(d), 22 (1992). Thus, for closely held corporations, the chancellor has the discretion to treat a derivative action as a direct action and excuse the plaintiff from the written-demand requirement, as long as the chancellor finds one of the *Derouen* requirements is met.

### B.    Characteristics of Closely Held Corporations

¶34.    "A close corporation is a business entity with few shareholders, the shares of which are not publicly traded." *Fought v. Morris*, 543 So. 2d 167, 169 (Miss. 1989). "Management typically operates in an informal manner, more akin to a partnership than a corporation." *Id.* A close corporation functions as a small business, when "the shareholders, directors, and

15

managers often are the same persons." *Id.* at 170. Close corporations often are made up of family members when the directors, officers, and shareholders are the same. *Id.* at 171. "Each contributes . . . capital, skill, experience, and labor to the company. Management and ownership are substantially identical. Each shareholder has an inside view of the company's operations and maintains an element of trust and confidence in each other which is commonly lacking in a large or publicly-held corporation." *Id.*

¶35. The parties here, as brother and sister, both served as officers, directors, and sole shareholders of the corporations. We find that the Restaurant, the Trailer Park, and the Campground companies undoubtedly are closely held corporations.

### C. Direct Action v. Derivative Action

¶36. Since the companies are closely held corporations, we turn to whether Jo Ann's action is a derivative or direct action. "There is little case law in Mississippi which addresses the difference between derivative and direct actions, but the general rule is that derivative actions seek recovery for injuries to the corporation." *Mathis v. ERA Franchise Sys., Inc.*, 25 So. 3d 298, 303 (Miss. 2009) (citing *Bruno v. Sw. Servs., Inc.*, 385 So. 2d 620, 622-23 (Miss. 1980)). Section 7.01 of the *Principles of Corporate Governance* states:

> (a) A derivative action may be brought in the name or right of a corporation by a holder . . . to redress an injury sustained by, or enforce a duty owed to, a corporation. An action in which the holder can prevail only by showing an injury or breach of duty to the corporation should be treated as a derivative action.

> (b) A direct action may be brought in the name and right of a holder to redress an injury sustained by, or enforce a duty owed to, the holder. An action in which the holder can prevail without showing an injury or breach of duty to the

corporation should be treated as a direct action that may be maintained by the holder in an individual capacity.

*Mathis,* 25 So. 2d at 303 (quoting *Principles of Corporate Governance* § 7.01 at 17).

¶37.   "The action is derivative if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual shareholders, or if it seeks to recover assets for the corporation or to prevent the dissipation of its assets." *Mathis*, 25 So. 3d at 303 (quoting 12B William Meade Fletcher, *Cyclopedia of the Law of Corporations* § 5911 (Rev. Ed. 2009)). "Thus, in determining whether the action belongs to the corporation or the individual, the focus of the inquiry is whether the corporation or the individual suffered injury." *Mathis*, 25 So. 3d at 303.

¶38.   In the present case, Jo Ann sought an accounting, asking the chancellor to compel Gerald to produce all financial records and to appoint a special master to examine the records and issue a report. Jo Ann also requested that the chancellor judicially dissolve the corporations and compel a stockholders' meeting to dissolve the corporations. She further asked that the chancellor partition and distribute real property owned by the corporations. "An action to inspect corporate books and records is a direct action." *Principles of Corporate Governance* § 7.01 at 18 cmt. (c). "Actions to require the holding of a shareholders' meeting and actions to compel dissolution, appoint a receiver, or obtain similar equitable relief are direct actions." *Id.* Thus, we find no standing issue as to Jo Ann's accounting and corporate-dissolution claims, as they are direct actions.

¶39.   Jo Ann also maintained in her complaint that, as a fifty-percent owner of the Campground corporation, Gerald owed a fiduciary duty to her to account for all profits and

17

expenses and to divide the proceeds, and that he failed and refused to do so. She stated she was entitled to fifty-percent of the profits of the Campground corporation and that the chancellor should enter a money judgment.

¶40. This proposition that a shareholder exercising control over a closely held business owes a fiduciary duty to the other shareholders comes from the seminal case *Fought v. Morris*, 543 So. 2d 167 (Miss. 1989). *Fought* also involved dissension among shareholders in a close corporation. *Id.* at 169. Fought, the vice-president; Morris, the president; and Strong and Peyton each had equal shares. *Id.* at 168. Morris bypassed the stock-redemption agreement when he purchased Peyton's stock, and Fought filed suit. *Id.* at 169.

¶41. This Court held that "in a close corporation where a majority stockholder stands to benefit as a controlling stockholder, the majority's action must be 'intrinsically fair' to the minority interest. Thus, stockholders in close corporations must bear toward each other the same relationship of trust and confidence which prevails in partnerships . . . ." *Id.* at 171. The Court found that the controlling shareholder had breached his fiduciary duty to the corporation and other shareholders by purchasing stock in violation of the terms of the stock-redemption agreement. *Id.* at 172-73. *Fought*, however, does not provide any analysis on whether the claim for a breach of fiduciary duty is a direct action or a derivative action.

¶42. Gerald chiefly relies on two cases, *Derouen v. Murray* and *Mathis v. ERA Franchise Systems, Inc.*, to argue that Jo Ann's claims were derivative in nature. *Derouen*, 604 So.2d at 1088; *Mathis*, 25 So.3d at 301. A derivative claim, Gerald argues, would be for the $180,000 Jo Ann claims Gerald improperly utilized out of the proceeds of the corporations

18

to purchase the stock of the minority shareholders. The present case, however, is distinguishable from *Derouen* and *Mathis*.

¶43.    *Derouen v. Murray* involved shareholders each with a fifty-percent ownership of a closely held corporation. *Derouen*, 604 So. 2d at 1088. One shareholder, Derouen, challenged the propriety of the other shareholder/president's actions after sale of the corporation's operations. The other shareholder/president later had formed a new corporation which acquired the first corporation's assets. *Id.* Derouen, named the president, Murray, as the sole defendant in his complaint. *Id.* at 1089. From the outset the chancellor saw Derouen's action as an individual action against Murray. *Id.* at 1090.

¶44.    Upon review, this Court stated "Derouen has never called his action a 'shareholder's derivative action,' but looking to its nature, the proof he made and the relief he sought, that is exactly what it is." *Id.* "When, as here, Derouen charges Murray's breach of his fiduciary duty of fair dealing to the corporation, he charges a violation of Murray's duties to the corporation and only derivatively owed him." *Id.* at 1091.

¶45.    Although the Court found the action in *Derouen* was derivative in nature, "the opinion stated in a footnote that it could have been brought as a direct action." *Mathis*, 25 So. 3d at 301 (citing *Derouen*, 604 So. 2d at 1091). According to the *Derouen* doctrine:

> (d) In the case of a *closely held corporation* . . . , the [chancery] court in its *discretion* may treat an action raising derivative claims as a *direct action*, *exempt* it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, *if* it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

19

*Derouen*, 604 So. 2d at 1091 n.2. (emphasis added).

¶46.    However, because the chancellor did not consider the issue of whether or not the plaintiff's claim was a direct or derivative action, this Court did not address it. *Derouen*, 604 So. 2d at 1091 n.2.

¶47.    Gerald also cites *Mathis v. ERA Franchise Systems* to support his argument that Jo Ann could not bring the derivative action as a direct action. *Mathis*, 25 So. 3d at 301. *Mathis* is distinguishable as well. In *Mathis*, the shareholder of a closely held corporation known as Real Estate Professionals, LLC ("REP"), attempted to bring a derivative claim as a direct action, but the chancellor dismissed for lack of standing. *Id.* at 299. This Court affirmed the chancellor. *Id.* at 299. The Court did not extend the *Derouen* doctrine[7] in *Mathis*.

¶48.    "Keeping in mind that [applying the *Derouen* doctrine] is a question left to the discretion of the trial judge," this Court found "that the complexity of this case militates against application of the doctrine. A review of cases from other jurisdictions reveals that the doctrine is almost always employed in purely intracorporate disputes." *Mathis*, 25 So. 3d at 302. This Court continued to explain why the *Derouen* doctrine could not be applied in that case:

> Although Mathis has filed suit against his current and former business partners, there are four defendants who are not and have never been owners or members of REP. Given the number of parties involved and the existence of several counterclaims and cross-claims, it is likely that a direct recovery would interfere with a fair distribution of the recovery or expose the corporation to

---

[7] We also have referred to the *Derouen* doctrine as the "*Murray* exceptions." *Phillips Brothers v. Winstead*, 129 So. 3d 906, 921-22 (Miss. 2014).

> a multiplicity of actions. Moreover, ERA has asserted that it is owed $300,000 from REP, making it a potential creditor that would be prejudiced if Mathis were to receive an individual recovery.

*Id.*

¶49.    We acknowledge that the chancellor, rather than this Court, was required to make a *Derouen* finding. The chancellor apparently based his decision to treat the closely held corporations as partnerships under the authority of *Fought*, but he made no on-the-record finding as required by *Derouen*. We find, however, that this error was harmless. If the chancellor had made an on-the-record *Derouen* finding, the result would have been the same.

¶50.    Unlike in *Mathis*, neither Jo Ann nor Gerald presented any evidence that there were any potential creditors that could be prejudiced.[8] Further, there is no danger of a multiplicity of suits, since Jo Ann and Gerald were the only two shareholders. There also is no indication that a direct action would interfere with a fair distribution of the recovery among all interested persons, because the only persons interested are Gerald and Jo Ann.

¶51.    Jo Ann's claims for an accounting and to compel a shareholders meeting to dissolve the corporations are direct actions, and thus not subject to the written-demand requirement for derivative actions. Jo Ann's claim for a breach of fiduciary duty, while held to be derivative in other cases, can be treated as a direct action for the reasons discussed. Thus, we find that Jo Ann had standing to bring this action and was excused from the written-demand requirement.

---

[8] The People's Bank had been dismissed. No other creditors were joined as parties, nor were any outstanding debts identified during the trial.

**II. Whether the chancellor erred by granting relief beyond the scope of the pleadings asserted by Jo Ann.**

*and*

**III. Whether the chancellor committed error by granting relief as to the divestment, division, and distribution of the assets of the corporate parties, outside the process of the corporate dissolution statutes.**

¶52. Gerald argues that the chancellor erred in granting relief beyond the scope of the claims asserted by Jo Ann. He claims that, under Mississippi Rule of Civil Procedure 8(a), Jo Ann was required to set forth direct or inferential factual allegations respecting each material element necessary to entitle her to recovery under an actionable legal theory. Gerald argues the claims on which the chancellor premised a substantial portion of the Amended Final Judgment were not pleaded or asserted by Jo Ann. Such claims are: (1) seeking to treat the corporations as a "family partnership"; (2) the divestiture of Gerald's stock interest in the Trailer Park; (3) damages as a derivative claim brought by Jo Ann; (4) the assessment of attorney's fees and/or court costs on a basis other than what was set out in Mississippi Code Section 11-21-31; (5) the direct dissolution of the Trailer Park and the Restaurant; (6) the partition of property solely held in the name of the corporations; (7) piercing the corporate veil and setting aside the corporations; and/or (8) breach of a fiduciary duty by Gerald toward Jo Ann outside of an accounting. Gerald further contends that none of these claims was tried by implied consent.

### A. Jo Ann's Corporate-Dissolution Claim

¶53.    Mississippi is a "notice pleadings" state. ***Upchurch Plumbing Inc. v. Greenwood Utils. Comm'n***, 964 So. 2d 1100, 1117 (Miss. 2007). A claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief, and, a demand for judgment for the relief to which he deems himself entitled. Relief in the alternative . . . may be demanded." M.R.C.P. 8(a). "Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleadings or motions are required." M.R.C.P. 8(e)(1). "All pleadings shall be so construed as to do substantial justice." M.R.C.P. 8(f). "Every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled by the proof and which is within the jurisdiction of the court to grant, *even if* the party has not demanded such relief in his pleadings." M.R.C.P. 54(c) (emphasis added).

¶54.    In her complaint, Jo Ann asked the chancellor to dissolve the Restaurant corporation under Mississippi Code Section 79-4-14.30(2)(i-iv), to judicially dissolve the Trailer Park corporation, and to compel a shareholders' meeting to authorize the dissolution of the corporations. Toward the end of trial, Jo Ann expressed that she was not going forward with her dissolution claim, though it is unclear from the record whether the parties were referring to statutory dissolution, judicial dissolution, or both. The chancellor acknowledged this and stated he would re-open the record to allow Gerald to address the claims for dissolution if Jo Ann later decided to pursue that claim. The issue was never again addressed during trial.

¶55.    Gerald argues that, although there was never a formal dismissal of Jo Ann's claim, the chancellor was without authority under Sections 79-4-14.30, 14.33, and 14.34 of the

Mississippi Code to dissolve, divest, divide, and/or distribute the assets contained in the corporations. So, Gerald argues, the particular relief granted by the chancellor was not available. Gerald further argues the pleadings should not be considered amended under Rule 15(b) of the Mississippi Rules of Civil Procedure, because Gerald would suffer prejudice from such amendment. *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44 (Miss. 1998).

¶56.    We find that the rules governing amendments under Rule 15(b) are not applicable here. Amending the pleadings to conform with the evidence concerns "issues not raised by the pleadings [that] are tried by expressed or implied consent." M.R.C.P. 15(b). Jo Ann initially sought to dissolve the corporations. Nothing was formally adjudicated after she expressed her desire not to pursue dissolution. The chancellor stated, "[I]t was my understanding that . . . the *issue of dissolution would remain in the complaint*, with the understanding it would not be urged but could be brought up if tax issues were somehow resolved or worked into the total issue of this lawsuit." The chancellor left the dissolution claim in the complaint "to accommodate either a resolution or some agreement if in the event they elected to proceed." Notwithstanding whether the issue of dissolution was still before the chancellor, we find the relief granted was adequately pleaded and the chancellor was cloaked with sufficient authority to grant the relief ordered in this case.[9]

---

[9] Although it is not binding authority, we note a case from Illinois that held that a court's oral statement that a counterclaim might be withdrawn did not affect the withdrawal, because no order permitting withdrawal was entered on the record. *Galter v. Galter*, 323 Ill. App. 297, 55 N.E. 2d 405 (1944).

### B. Whether the chancellor erred in denying Gerald's election to purchase shares.

¶57. Section 79-4-14.30(a)(2)(i-iv) of the Mississippi Code provides the grounds for dissolution in a proceeding by a shareholder and also states that "shareholders may elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares." Miss. Code Ann. § 79-4-14.34 (a)(Rev. 2013). This election is "irrevocable *unless the court determines that it is equitable to set aside or modify the election*." ***Id.*** (emphasis added). Gerald elected to purchase all the shares owned by Jo Ann at fair value, but the chancellor determined it was equitable to set Gerald's election aside.

¶58. Gerald argues that, since the chancellor set aside the election to purchase Jo Ann's shares of the Trailer Park and the Restaurant, the chancellor was no longer clothed with broad authority under Sections 79-4-14.30, 14.33, and 14.34 of the Mississippi Code to dissolve, divest, divide, and/or distribute assets contained in the corporations. Outside the scope of a dissolution action, Gerald argues, the chancellor is not authorized to utilize these equitable powers because such powers are to be relied upon when an election to purchase has been asserted. Gerald cites ***In the Matter of Will and Testament of Hardin***, 158 So. 3d 341 (Miss. Ct. App. 2014), to support this argument.

¶59. We find ***In re Hardin*** does not support Gerald's assertion that a chancellor is cloaked with broad equitable relief only if he grants the election to purchase the petitioning shareholder's shares. In ***In re Hardin***, a shareholder filed an action under the Mississippi Business Corporation Act to judicially dissolve an incorporated family farm, which was owned by four shareholder siblings. ***In re Hardin***, 158 So.3d at 343. The corporation moved

25

to elect to purchase the petitioning shareholder's shares, which the chancellor granted. *Id.* at 344. The chancellor ordered the corporation to convey to the shareholder a portion of real property instead of a cash buyout. *Id.* The Court of Appeals held that "the chancellor was still within his right to reserve an in-kind division of land in lieu of a cash payment. Section 79–4–14.34(i) specifically allows for the 'inherent equity powers of the court to fashion alternative remedies to judicial dissolution.'" *Id.* at 346. We find that nothing in this case or the dissolution statutes suggests that a chancellor must grant the election to purchase the petitioners' shares before continuing to exercise his broad equity powers in granting relief under Section 79-4-14.34 (i) of the Mississippi Code.

### C.   *Alternative Remedies to Dissolution*

¶60.   We now turn to the relief granted by the chancellor. In an action to judicially dissolve a corporation, a chancellor does not have to order a dissolution, even if grounds such as oppression or deadlock are met. This is because the general view in Mississippi is that "[d]issolution is an extraordinary remedy to be sparingly administered in exceptional cases only." *Capitol Toyota, Inc. v. Gervin*, 381 So. 2d 1038, 1039 (Miss. 1980). However, "if the strife among the participants has been so long and bitter that the former relationships of congeniality and trust cannot be re-established [like Jo Ann and Gerald's case], there is little left that an unhappy shareholder can do except . . . bring about the dissolution of the business." F.H. O'Neal & R. Thompson, *O'Neal's Close Corporations* § 9.04 (3d ed. 1971). "But the more common relief in modern cases . . . is to provide relief alternative to dissolution." *Id.* at § 9.25. Mississippi's corporate dissolution statute states that "[n]othing

26

contained in this section shall diminish the *inherent equity powers of the court to fashion alternative remedies to judicial dissolution*." Miss. Code Ann. § 79-4-14.34 (i) (emphasis added).

¶61. Contrary to Gerald's assertion, the chancellor did not dissolve the corporations. Instead, he fashioned an alternative remedy to this problem. The chancellor found that the source of funds for the $180,000 Gerald used to purchase the minority shareholders' interest in the Trailer Park and the Restaurant corporations came from the corporations themselves. Those shares were purchased with funds equitably owned by both Jo Ann and Gerald. So Gerald's purchase was for the benefit of both parties. The chancellor then disregarded the shares purchased by Gerald and considered Jo Ann and Gerald to be equal shareholders in the Restaurant and the Trailer Park. After equalizing their interests in the corporations, the chancellor ordered that the property lines be modified by survey to reflect that Jo Ann and Gerald owned fifty-percent of the land upon which the Trailer Park and the Campground were situated.

¶62. The Amended Final Judgment from which Gerald appeals states "that the Court *divides*, *partites*, and *equitably separates* the parties by granting each full ownership of separate companies . . . ." He then granted Jo Ann full ownership of the Trailer Park, and Gerald full ownership of the Campground. The chancellor ordered "that each of the parties is to execute the necessary documents, including deeds, bills of sale and stock certificates to accomplish the directions of the court." Nowhere in the Amended Final Judgment does the chancellor mention "dissolution." The chancellor did quite the opposite when he fashioned

an alternative remedy to dissolution, which he had full authority to do under Section 79-4-14.34 (i) of the Mississippi Code.

¶63.    Since the chancellor did not order a direct dissolution of the corporations, Gerald's argument that this "equitable distribution" method violates the method provided by the Mississippi Legislature in Section 79-4-14.05 to dissolve a corporation and distribute its assets among its shareholders according to their interests is without merit.

¶64.    We cannot locate any precedent in which a chancellor has granted this exact, or even similar, relief. However, we note that "[i]t is not necessary that some exact precedent be found for extending relief in a given situation." *Griffith's Mississippi Chancery Practice* § 35 (2000 ed.) (citing ***Miller v. Doxey***, 1 Miss. 329, 333 (1829)). If a certain form of "relief is clearly requisite and a practical remedy may be applied, such remedy is not to be denied because that remedy has never been applied in just that manner to that exact state of case." ***Id.*** The question for this Court to decide, then, is whether the relief granted here is an appropriate remedy under Mississippi Code Section 79-4-14.34(i), which states "*[n]othing* contained in this section shall diminish the inherent equity powers of the court to fashion alternative remedies to judicial dissolution." Although little caselaw addresses Mississippi's alternative-remedy provision, substantial precedent supports the chancellor's broad powers to provide an equitable solution in cases such as this. *See, e.g.*, ***In re Hardin***, 158 So. 3d at 346.

¶65.    Other jurisdictions offer guidance as to appropriate remedies to resolve disputes among dissenting shareholders in a close corporation. Some courts have resorted to remedies

28

listed by statute, while others have fashioned remedies not specifically mentioned in a statute. *O'Neal's Close Corporations* at § 9.35. The corporate statutes in California and North Dakota, for example, authorize a court to "grant any equitable relief." *Id.* at § 9.35; *see* Cal. Corp. Code § 1804, and ND Cent. Code § 10-19.1-115.

¶66. "In many states the statute authorizes courts to provide relief other than dissolution, and then sets out a nonexclusive list of what that relief may be." *O'Neal's Close Corporations* § 9.35; *see e.g.*, Me. Rev. Stat. Ann. tit. 13A, § 1123; SC Code Ann. § 33-14-310. "In the absence of statute, courts [show] a willingness to fashion a remedy that is best suited in the particular factual circumstances to resolve the problem presented to the court." *O'Neal's Close Corporations* at § 9.35. In ***Baker v. Commercial Body Builders, Inc.***, the Supreme Court of Oregon listed several remedies available for oppressive conduct as an alternative to dissolution. ***Baker v. Commercial Body Builders, Inc.***, 507 P.2d 387, 395-96 (1973). Subsequently, courts across the country have applied one or more of the remedies listed in ***Baker***, and other courts have fashioned remedies in addition to those in ***Baker***. A sample of such remedies includes:

(1) Ordering issued stock to be cancelled or redeemed [to] achieve a 50/50 balance or some other ownership structure fair to the shareholders.
(2) Permitting the minority to purchase additional shares . . . .
(3) Treating a group of related corporations as a single entity for the purpose of determining appropriate relief.
(4) Awarding damages to the minority shareholder as compensation for injuries suffered by oppressive conduct, sometimes including the awarding of punitive damages.

*O'Neal's Close Corporations* at § 9.35.

¶67.    After reviewing these alternative remedies, and in light of all the particular factual circumstances of this case, we find that granting full ownership in the respective separate corporations operated individually by Gerald and Jo Ann was a practical, fair, and just remedy to resolve the dispute. A chancellor's remedial powers have long been "marked by plasticity." *Griffith's Mississippi Chancery Practice* § 35 (citing **Hall v. Wood**, 443 So. 2d 834, 843 (Miss. 1983)). "Equity jurisdiction permits innovation that justice may be done." *Id.* If ever a case needed the innovation allowed by equity jurisdiction, it is this one. Considering that *nothing* "shall diminish the inherent equity powers of the court to fashion alternative remedies to judicial dissolution," Miss. Code Ann. § 79-4-14.34 (i), we find that the chancellor did not abuse his discretion in fashioning this alternative remedy.

### D.    Jo Ann's Breach-of-Fiduciary-Duty Claim

¶68.    Gerald also argues that Jo Ann did not plead a breach-of-fiduciary-duty claim in her complaint, and that the equitable-division method the chancellor used contradicts this Court's precedent that a breach of a fiduciary duty in a closely held corporation is an intentional tort that allows only a judgment for damages.

¶69.    We find that Jo Ann adequately stated a claim for breach of fiduciary duty. Jo Ann argued in her complaint that, as a fifty-percent owner of the Campground corporation, Gerald owed a fiduciary duty to her to account for all profits and expenses and to divide the proceeds, and that he failed and refused to do so. She stated she was entitled to fifty percent of the profits of the Campground corporation and that a money judgment should be entered. As Gerald correctly argues, this fiduciary duty Jo Ann refers to in her complaint is not in

30

reference to Gerald's purchase of the minority shareholders' shares to gain control of the corporations. Jo Ann never moved to amend her complaint to adjust this claim.

¶70.    Although the claim for a breach of fiduciary duty regarding Gerald's purchase of the minority shareholders' interest was not in the complaint, we find the claim was sufficiently before the chancellor and the parties. Gerald purchased the shares of the minority shareholders in the Restaurant and the Trailer Park for $180,000 during litigation and then tried to vote Jo Ann off the board. In response, Jo Ann sought a preliminary injunction to keep Gerald's meeting from taking place, and she pleaded and argued at trial that Gerald owed a fiduciary duty to her as a minority shareholder in a closely held corporation. On direct and cross-examination, both attorneys questioned Gerald and his witnesses as to the source of the $180,000 and his reason for buying out the minority shareholders. Thus, we find Jo Ann's breach-of-a-fiduciary-duty claim against Gerald for using corporate funds, in which she held an equal interest, to purchase the minority shares to her detriment and oppression was before the chancery court.

¶71.    If this is true, Gerald argues, according to *Phillips Brothers v. Winstead*, a breach of a fiduciary duty in a closely held corporation is an intentional tort that allows only a judgment for damages. *Phillips Brothers v. Winstead*, 129 So. 2d 906, 924 (Miss. 2014). This equitable-division method the chancellor employed, Gerald argues, is wrong. We disagree. Dividing the parties' interests in the properties and granting each full ownership in their respective corporations was an alternative remedy to the dissolution action–not a remedy for a breach of fiduciary duty. In fact, no damages for a breach of fiduciary duty were awarded

31

in the Amended Final Judgment. Because this remedy of equitable relief to resolve the dispute between the Gerald and Jo Ann was appropriate under the alternative-remedy provision under Section 79-4-14.34(i) of the Mississippi Code, we find this argument is without merit.

>    **III.    Whether the chancellor erred in ordering partition by sale or in kind of real property solely held in the names of the corporate parties.**

¶72.    In order for the chancery court to acquire jurisdiction under Section 11-21-3 of the Mississippi Code over a parcel of real property for purposes of partition in kind or partition by sale, the property must be held by joint tenants, tenants in common, or coparceners. ***Yeats v. Box***, 198 Miss. 602, 22 So. 2d 411, 415-16 (1945); ***Coers v. Williams***, 74 So. 2d 836, 839-840 (Miss. 1954). If the title to the subject property is not held as tenants in common or jointly, then the chancery court has no jurisdiction to entertain a partition by sale or in kind, and the party bringing the action has no standing to sue. ***Cooper v. Fox***, 7 So. 342, 343-44 (Miss. 1890).

¶73.    At all times, the Restaurant and the Trailer Park held title to their respective tracts of real property solely in their corporate names. Gerald argues that Jo Ann did not have standing to bring any independent action under Mississippi Code Section 11-21-3, so the chancellor committed reversible error by ordering partition of the Restaurant and the Trailer Park real property. We address these two parcels separately.

32

### A. Partition of the Trailer Park

¶74. The Trailer Park held title in its corporate name to the parcel of land on which it operated. Gerald argues that, because this parcel of land was not held by joint tenants or tenants in common, the chancellor was without authority to partition the land under Section 11-21-3 of the Mississippi Code. However, no partition of the land owned by the Trailer Park was ordered. The chancellor partitioned the adjacent Campground property, which was held by Gerald and Jo Ann as tenants in common. The Campground's eastern boundary line and the Trailer Park's western boundary line run adjacent to each other. The adjusted boundary line affected the western portion of the Campground property, which was jointly owned property. So the chancellor partited the Campground, not the Trailer Park real property.

¶75. Because the chancellor partited the Campground property, and since Jo Ann and Gerald held interest in the Campground as tenants in common, Gerald's argument that the chancellor erred in ordering a partition of the Trailer Park is without merit.

### B. Partition of the Restaurant

¶76. Gerald asserts that the chancellor erred in ordering the Restaurant and its property sold. Under Section 11-21-11 of the Mississippi Code, the parties must be cotenants for the chancellor to order a sale of the land. Here, title was held solely in the name of the Restaurant and not by Gerald and Jo Ann as tenants in common. It does not appear, nor was there any argument advanced, that the Restaurant could be partited in kind. So partition by sale was the only available method. The chancellor signed an order authorizing the sale of the Restaurant. More importantly, Gerald joined in the sale of the Restaurant property. All parties approved

the order, and the proceeds of the sale were distributed to Gerald and Jo Ann. Because Gerald joined in the sale, we find this issue is without merit.

    **IV.**     **Whether the chancellor committed error by divesting Gerald of his separate interest in the Trailer Park.**

    *and*

    **V.**     **Whether the chancellor erred in granting partition in kind between Jo Ann and Gerald without: (A) consideration of an accurate, up-to-date valuation of the remaining real properties, (B) consideration of the exclusive use or occupancy of subject real properties by Jo Ann and Gerald, (C) granting an access easement for ingress and egress to Gerald, and (D) consideration of Jo Ann's acquisition of the one-half interest of Gerald in the Imbronone property.**

¶77. Gerald argues that, even if the chancellor had the power to order a partition in kind of the Campground and the Trailer Park real property, then such partition must be in accordance with the statutory requirements of the partition statutes under Section 11-21-1 of the Mississippi Code. We already have found that the chancellor did not order a partition of the Trailer Park under Section 11-21-1. So Gerald's argument that the chancellor did not follow the requirements for a partition of land are without merit. Since the chancellor did order a partition in kind of the Campground, this is the only issue we will address.

    *A.*     *Consideration of an Accurate, Up-to-date Valuation of the Remaining Properties*

¶78. Gerald argues the chancellor erred by not considering an accurate valuation of the Trailer Park and the Campground properties. The chancellor divided these two properties in accordance with the appraiser's and surveyor's recommendations. According to the appraiser, the Trailer Park property and its use could have been valued separately from the Campground

34

property, and he had enough information to perform an independent appraisal of the Trailer Park, as he had done for the Restaurant. The appraiser testified that the reason he gave an appraisal for the Trailer Park property on an acreage basis was for divisional purposes. Gerald argues that, under *Murphree v. Cook*, 822 So. 2d 1092 (Miss. Ct. App. 2002), this is the type of ad hoc and arbitrary method of division of land in kind that is condemned by the Court of Appeals and constitutes reversible error. He argues that, once the chancellor set aside the interests of Gerald and Jo Ann, then he should have adjusted the equities between them as required by Section 11-21-9 of the Mississippi Code.

¶79.    In *Murphree v. Cook*, the Court of Appeals considered a chancellor's deviation from the partition statutes in a partition action. *Murphree v. Cook*, 822 So. 2d 1092 (Miss. Ct. App. 2002). Helen Cook, co-tenant, was in complete control of the property from shortly after the date of purchasing the property until when Murphree, the other co-tenant, filed a partition action to sever their tenancy in common. *Id.* at 1096. The chancellor did not partition the property under Section 11-21-3 of the Mississippi Code as Murphree requested. *Id.* at 1098. The chancellor used a complex calculation to determine what he felt to be the fair value of Murphree's half interest in the property. *Id.* at 1098. He ordered Murphree to convey his interest in the property to Cook upon receipt of payment of that sum.

¶80.    The Court of Appeals said "in every case that the chancellor proposes to subvert the detailed statutory procedures for a partition in favor of some ad hoc means of sale, especially when it is undertaken over the strenuous objection of one of the cotenants, that decision

35

would be subject to being set aside on appeal on an abuse of discretion standard." *Id.* at 1098-99.

¶81.    The chancellor in *Murphree* used the original purchase price when he divested Murphree of his interest in the property, even though the parties had purchased the property more than three years before the partition action. *Id.* at 1099. There was no evidence that the figure accurately reflected the market value of the property at the time of the partition. *Id.* at 1099. The Court of Appeals concluded that the means the chancellor used to value the co-tenants' interests in the property was arbitrary and was an abuse of discretion. *Id.* Because "Murphree's right to have his interest in the property set apart to him by a partition conducted according to the applicable statutes would seem to be preferred over some alternate plan devised by the chancellor," the Court of Appeals reversed and remanded for the chancellor to sever the tenancy in accordance with the statutes. *Id.*

¶82.    In *Cheeks v. Herrington*, a co-owner brought suit to partition property in which he had acquired an interest by intestate succession. *Cheeks v. Herrington*, 523 So. 2d 1033, 1034 (Miss. 1988). Cheeks alleged that the chancellor erred because he did not allow an accounting for improvements made to the property. *Id.* at 1036. Generally, "when a tenant in common is in possession of the entire property, and so long as he is not called on to pay for its use and occupation, he is under a duty to preserve the property and to make all ordinary repairs which will go to its preservation . . . ." *Id.* at 1037.

¶83.    This Court held "that making repairs which are necessary for the preservation and maintenance of property is the sole responsibility of the person in actual or legal possession."

36

*Id.* at 1037. Because the chancellor in *Cheeks* did not allow an accounting, this Court remanded the case for the chancellor to adjust the equities between the co-tenants under Section 11-21-9 and to present evidence as to what improvements had been made. *Id.* at 1037.

¶84. We find that the chancellor did not abuse his discretion here, and his actions are supported under *Cheeks* and *Murphree*. Gerald and Jo Ann held ownership in the Campground as tenants in common. And, like the co-tenant in *Cheeks*, Gerald was in actual possession of the Campground. But, unlike the chancellor in *Cheeks*, here the chancellor ordered a forensic accounting. He heard evidence from AVL's forensic accountant, the corporations' accountant, Jo Ann, and Gerald about improvements, repairs, and maintenance that Gerald had conducted on all the properties.

¶85. In 2006, the appraiser determined that the improvements on the property at that time were not utilizing the property to its highest potential value. He came to this conclusion based on a market-value approach. He was unable to use an income approach, because while Jo Ann provided rental-income information from the Trailer Park, he never received any rental-income information from Gerald for the Campground.

¶86. Again in 2012, the appraiser made another evaluation. He concluded that the Restaurant property had to be treated differently from the Trailer Park and the Campground properties, which he determined had the same value per acre. He noted again that he could not use an income approach to value the property because of the inaccuracy and unreliability of Gerald's records.

37

¶87. Even if, as Gerald suggests, the properties should have been valued separately, the appraiser could not have made a more accurate valuation. Gerald himself caused this problem by refusing to comply fully with requests from the chancery court, appraisers, accountants, and Jo Ann for documents and financial records.

### B. Consideration of the Exclusive Use of the Separate Properties by Jo Ann and Gerald

¶88. Gerald argues the chancellor erred in not considering the exclusive use by Gerald of the entire Campground property. Gerald and Jo Ann held title to the Campground property as tenants in common, and the parties did not dispute that Gerald had exclusive use of the Campground. Gerald obtained his income from the Campground without consulting Jo Ann, which had been the status quo over the previous decade. Gerald resided and also ran side businesses on the Campground. The chancellor reduced the original Campground acreage when he adjusted the property lines in accordance with the survey.

¶89. Gerald argues he is entitled to have the whole Campground property allocated to him since he has been in exclusive possession of it and has made improvements on the property. "[A] tenant in common who has improved the land is entitled to have such land allotted to him or her if there is a partition in kind." *Bennett v. Bennett*, 36 So. 452, 453 (Miss. 1904). "As a general rule, where a cotenant places improvements on the common property, equity will take this fact into consideration on partition and will in some way compensate him or her for such improvements . . . provided they are made in good faith and are of a necessary and substantial nature, materially enhancing the value of the common property." 68 C.J.S. *Partition* § 130 (2009).

38

¶90. As for Gerald's claim that the whole of the Campground property should have been allocated to him because he made improvements to the Campground, there is no evidence that Gerald improved the land. The appraiser determined in 2006 that the improvements on the property were not utilizing the property then to its highest potential value and, in fact, he opined the property would be worth more without the improvements. As to Gerald's argument the chancellor should have considered his exclusive possession of the Campground and awarded him the entire property, we find the chancellor did consider the exclusive use by Gerald when he granted Gerald full ownership of the Campground and all personal property located on it. Thus, we find the chancellor did not abuse his discretion in the allocation of the Campground property.

### C. *Access Easement for Ingress and Egress to Gerald*

¶91. Gerald argues that the partition of the property by the chancellor did not allow for an easement for ingress and egress, that it land-locks Gerald, and that it deprives him of access to and from Highway 90. Access to Highway 90 was first raised in a post-trial motion after the chancellor adjusted the property line. At the post-trial hearing before the chancellor in May 2014, Gerald admitted he had actual access on both the east and west sides of the Restaurant, which his daughters now own. The chancellor stated at the post-trial hearing, "[Gerald] can get an easement. Anything else on this part? Let's go to something else. Unless they're going to get in up here and testify that they refuse to talk to their father and give him an easement. That's ridiculous. All right. Let's go on." We decline to address this issue, as it is not ripe for review.

### D. The Imbornone Property (a.k.a. Necaise Claim)

¶92. Gerald and Jo Ann owned an additional tract of real property in equal shares as tenants in common on the south end of the properties, known as the Imbornone property. Originally, the chancellor considered this land in the division of real property, but it was lost at a tax sale during litigation. So the chancellor did not include it in the final judgment. By the time post-trial motions began and because the parties could not reach an agreement, Jo Ann personally bought the Imbornone strip from Mr. Imbornone, who previously had purchased it at the tax sale.

¶93. The parties informed the chancellor at the post-trial hearing that the Imbornone property was lost at a tax sale and recently had been purchased by Jo Ann. Since Jo Ann was a cotenant with Gerald, Gerald argues Jo Ann's purchase redeemed the acreage for both Jo Ann and Gerald. *Wall v. Wall*, 71 So. 2d 308, 311 (Miss. 1954); *Brown v. Brothers*, 97 So. 2d 642, 644-45 (Miss. 1957). Gerald asserts that he should be given credit for one-half of the Imbornone property, and the court should then order a partition in kind. Since the chancellor did not address the Imbornone property in the Amended Final Judgement, we decline to address this issue, as it was not before the trial court.

**VI. Did the chancellor commit error by not allowing the parties a fair opportunity to respond to the *sua sponte* exclusion of the AVL Forensic Accounting Report from evidence after the close of the record?**

¶94. Gerald argues that the chancellor erred in not allowing the parties a fair opportunity to respond to the chancellor's own motion striking various portions of the AVL report as inadmissible, when the report was fully admitted into evidence without any objection.

¶95. "Mississippi law requires the trial court to ensure that proposed testimony satisfies Rule 702 of the Mississippi Rules of Evidence." *Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 146 (Miss. 2007). Mississippi Rule of Evidence 702 provides:

> If . . . specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if . . . (3) the witness has applied the principles and methods reliably to the facts of the case.

M.R.E. 702(3).

¶96. This Rule "recognizes the gate keeping responsibility of the trial court to determine whether the expert testimony is relevant and reliable." M.R.E. 702 cmt. This Court "require[s] that, when an expert's opinion is challenged, the party sponsoring the expert's challenged opinion be given a fair opportunity to respond to the challenge. The provision of a fair opportunity to respond is part of the trial court's gate keeping responsibility." *Kilhullen v. Kansas City Southern Ry.*, 8 So. 3d 168, 174 (Miss. 2009) (quoting *Smith v. Clement*, 983 So. 2d 285, 290 (Miss. 2008)). "[W]e will reverse only where the trial court abused its discretion by clearly failing to provide a fair opportunity to respond." *Id.*

¶97. During trial, the chancellor admitted into evidence a report prepared by AVL, the forensic accounting firm appointed by the Court. Neither party objected to this admission. The AVL reports revealed the operations and management of the corporations under the control of both Gerald and Jo Ann showed a commingling of revenue and expenses. The AVL reports also showed that the completeness of revenues for both the Campground and the Trailer Park could not be proven. According to the report, Jo Ann had paid attorneys' fees

and the costs of litigation through revenue from the Trailer Park, and AVL did not consider this to be a normal expense. The AVL report also found that the Campground and the Trailer Park had understated revenues, caused by mismanagement, below-market rental rates, under-reported revenues and/or misappropriation of funds. The chancellor struck portions of the AVL report under Rule of Evidence 702(3):

> Though the Court ordered the forensic accounting and those experts attempted to do their job, *the Court also finds that the methods used by the forensic accountants may not be reliably applied to the facts of this case to establish the amount of misappropriation of moneys by Gerald*. The Court finds from the totality of the evidence that Gerald's Campground books, records and tax returns are false and incomplete as to both gross receipts and expenditures.

¶98.    The chancellor made this ruling after the close of the record. The chancellor also did not make any indication during trial that the AVL report was inadmissible or that the conclusions were not based upon the application of generally accepted principles of accounting and methods to the facts of this case as required by Rule 702(3).

¶99.    Gerald argues that the chancellor's striking of the report without giving a fair opportunity to respond is an abuse of discretion and constitutes reversible error, since the chancellor based his findings on his perception that Gerald alone had misappropriated $180,000 to purchase the minority stockholders' interest.

¶100.   The chancellor, though, did not find Gerald had misappropriated the $180,000 to purchase the minority shareholder's interest based solely on the AVL report. He reached this conclusion because he did not find the evidence presented by Gerald and his witnesses to be credible as to the source of those funds. Gerald presented no credible evidence of a bank loan or other "above board" loan from a third party. The chancellor found that Gerald had been

"less than forthcoming to the point of being secretive and non-responsive to discovery requests." The chancellor concluded that in "absence of credible proof from Gerald, the only source of funds available to him were from the Restaurant and Campground funds plus unreported income diverted from them in which Jo Ann had an equal interest."

¶101. We find the chancellor did not abuse his discretion in excluding portions of the AVL report. Even if the chancellor did abuse his discretion by not allowing the parties to object to the chancellor's own motion to exclude portions of the AVL report, this error was harmless. The chancellor did not exclude the entire report, but rather noted its limitations as a final statement on value. The chancellor accepted the report of the forensic accountant but found that the conclusions could not be accepted because of the unreliability of Gerald's books. This limitation on the use of expert evidence is within the decision-making power of the chancellor.

## CONCLUSION

¶102. For the foregoing reasons, we affirm the judgment of the Hancock County Chancery Court. We decline to address the issues about the Imbornone property and the easement for ingress and egress, as they are not ripe for review.

¶103. **AFFIRMED.**

**DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, PIERCE, KING AND COLEMAN, JJ., CONCUR.**

43



Scafidi's Wheel Inn Restaurant (55/45)

Wheel Inn Trailer Park (operated by Hille) (60/40)

Jo Ann Hille house & property

Property owned jointly by G. Scafidi & Jo Ann Hille; no company (G. Scafidi operates Park/campground) Park/campground) (50/50)

Exhibit 37 Case #
Evd ___ ID ___ Date ___