# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-CA-00229-SCT

*WILLIAM LEO BOATRIGHT AND KELLEY BOATRIGHT*

*v.*

*A & H TECHNOLOGIES, INC., CHESTER H. ABBOTT AND CAROL ABBOTT*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/20/2018 |
| TRIAL JUDGE: | HON. MICHAEL L. FONDREN |
| TRIAL COURT ATTORNEYS: | WILLIAM V. WESTBROOK, III |
| | DAVID ANDREW WHEELER |
| | RUSSELL SCOTT MANNING |
| | NICHOLAS VAN WISER |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | WILLIAM V. WESTBROOK, III |
| ATTORNEYS FOR APPELLEES: | DAVID A. WHEELER |
| | RUSSELL SCOTT MANNING |
| NATURE OF THE CASE: | OTHER |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART.  ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART; REVERSED AND RENDERED IN PART - 06/04/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., MAXWELL AND GRIFFIS, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     In June 2014, Chester Abbott, as majority shareholder and director of A&H Technologies, Inc., formally noticed a special shareholder meeting.  The meeting was to be

held on July 23, 2014, in Mississippi. William Boatright, the only other shareholder, could not attend because he was working on an A&H project out of state. Despite William's conflict, Chester proceeded with the meeting as the sole shareholder in attendance.

¶2. Chester re-elected himself the lone director of A&H. He further determined he had been the only elected director of the company since 2001. Finally, he addressed the six-figure bonus he gave himself in December 2013, recording on the minutes that it was based on "his extraordinary work and effort to continue to build business and upon his forgoing any bonus for 2009 to 2012." Chester held a board-of-directors meeting that same day. Chester elected himself president of A&H. Chester replaced William as vice president with his daughter-in-law Cynthia Abbott. And he replaced William's wife, Kelley Boatright, as secretary/treasurer with his own wife, Carol Abbott.

¶3. William sued Chester and A&H the next day, alleging that Chester's oppressive conduct toward William was detrimental to A&H. In his complaint, William sought both to replace Chester as president of A&H and to become majority shareholder. Alternatively, he requested dissolution. After four years of litigation, the chancellor met William halfway. Before the lawsuit, Chester owned 51% of A&H's shares, and William owned 49%. The chancellor ordered a stock transfer that would make William a 50% owner, equal with Chester, and directed William have equal say.

¶4. William appealed, and Chester cross-appealed. Based on the arguments presented to this Court, each man would much prefer he owned the majority of A&H's shares and thus had outright control. But the equitable remedy the chancellor chose was within his authority

2

and discretion. And our standard of review gives great deference to such decisions. Thus, we affirm this central aspect of the chancellor's judgment.

¶5. The judgment addressed other claims, some granted and some denied, and ordered additional remedies. William and Chester also challenge these decisions respectively. As explained below, we affirm in part and reverse and remand in part William's direct appeal. And we affirm in part, reverse and remand in part, and reverse and render in part Chester's cross-appeal.

## Background Facts & Procedural History

### I. Formation and Evolution of A&H

¶6. Chester and William's relationship was not always so contentious.

¶7. A&H provides technical services for naval ships. A&H has one client, naval contractor SENTEL, Inc. In 1998, Chester formed A&H with then business partner James Hawkins. The two men incorporated their business and issued themselves 2,500 shares of common stock each, 5,000 shares total. They also entered into a shareholder agreement giving each other the right to purchase the other's stock if one of them left A&H. This agreement was to be binding on and benefit any later shareholders. Both men worked for the company. A&H also employed Chester's wife Carol as office manager. Chester served as company president, James as vice president, and Carol as secretary/treasurer.

¶8. Within the first year, William came on board as an engineer. While A&H is based on the Mississippi Gulf Coast, William worked out of Norfolk, Virginia.[1] To incentivize

---

[1] Over the years, A&H has employed additional engineers in Virginia and on the Mississippi Gulf Coast.

William to stay with A&H, in 2004, Chester and James each gave William 125 shares of A&H stock, a total of 250 shares or 5% ownership.

¶9.     A year later, James left A&H to pursue other ventures.  He resigned as vice president and transferred his 2,375 shares to Chester.   His only compensation was outstanding wages. William would later claim he had not known about the stock transfer until 2014.[2]

¶10.    William did, however, participate in a shareholders' meeting in 2008. At this meeting, the two owners adopted several resolutions, one that would prove important to this litigation. After adopting two resolutions in which each agreed to transfer his stock to the other at his death in exchange for an annual stipend for his widow, they next resolved, "[u]pon health conditions which would render Chester Abbott unable to make informed decisions as president and majority stockholder in the management of the corporation William Boatright will assume the office of President and its responsibilities."  The two also approved of a stock reallocation, with Chester transferring 500 shares to William.  At the next annual meeting, William was elected vice president of A&H.  Chester remained president and director, and Carol remained secretary/treasurer.

¶11.    In 2010, A&H hired William's wife Kelley part time to take over some of Carol's office duties.  Eventually, Carol retired, and Kelley became the office manager.  Kelley also

---

[2] When James left, he and Chester executed a partnership dissolution agreement. This agreement made no mention of William's 5% ownership but instead indicated Chester would become the "sole owner" of A&H after James's departure.

served as the facility security officer (FSO) of A&H's Virginia office.[3] And in January 2013, Kelley was appointed to replace Carol as secretary/treasurer.

## II.    Deterioration of Relationship

¶12.    In June 2012, Chester made William 49% owner by giving him another 1,700 of his shares. The following year, over a series of months, the two men exchanged emails trying to hammer out an agreement in which Chester would retire and transfer his 51% ownership to William. But negotiations broke down.

¶13.    From the record, the first snag was in April 2013, when Chester directed Kelley to make out two checks totaling $1,000 to the nonprofit 4H. William wrote to Chester on company letterhead that Chester was not authorized to distribute William's share of corporate funds.

¶14.    Another sticking point was rent for A&H's Virginia office. William and Kelley owned the office building, and A&H paid them rent. William wanted to raise the rent, but Chester refused, noting the Gulf Coast employees, including Chester and Carol, worked from their homes.[4]

¶15.    The final straw was the 2013 year-end bonuses. Each year, A&H gives employee bonuses to avoid making a taxable profit. On December 13, 2013, Chester emailed Kelley with employee-bonus directions. Chester awarded three employees, including William,

---

[3] The Department of Defense requires all federal defense contractors such as A&H to appoint an FSO to direct and supervise the handling of classified information.

[4] According to the Boatrights, working from home was not feasible. They resided in nearby North Carolina but had Virginia health insurance. Their daughter had a preexisting condition. So they needed an office in Virginia to maintain insurance coverage.

$8,000 each and his daughter-in-law Cynthia, also an employee, $3,000. Chester gave himself $105,000. Chester provided no bonus for Kelley. When Kelley expressed disappointment, Chester told Kelley to ask William what he had called Chester when they were both recently working together in San Diego, California. Apparently, William had called Chester "greedy," which in Chester's own words "pissed [him] off." In a second email to Kelley, Chester explained that "[w]hat I've done this year is demonstrate what greedy is. The bonuses stay as indicated. If William had excepted [sic] my offer to retire he would have had $130 K to do with as he pleased this year." Chester would later testify he set the amount of his bonus to even out the compensation he and William had received from A&H over the past several years. Even when including the bonus, he asserted that the Boatrights had received 46.46% of the total shareholder compensation, despite William's being only a 15% shareholder most of that time.

¶16. Things got no better in 2014. That January, Chester's daughter-in-law Cynthia signed a significant agreement with A&H's sole client in her purported capacity as "Pending President/Chairman of A&H Technologies, Inc." Chester and William also clashed over the hiring of a new engineer and whether the company could afford to pay her. Things got so bad that in May 2014 William requested through his attorney an informal meeting with Chester.

¶17. Chester declined. Instead, he called the July 2014 special shareholder meeting that prompted this case—the meeting in which Chester elected himself sole director and made his daughter-in-law and wife corporate officers instead of William and Kelley. Chester's first

response to William's lawsuit against him and A&H was to revoke the 2008 shareholder resolutions.

### III.    Litigation

¶18.    The lawsuit lasted four years.  William had brought a derivative action, a direct action for corporate freeze out, a claim for breach of contract of the 2008 shareholder resolutions, and a claim for a constructive trust over 5% of the shares James transferred to Chester in 2005.  William sought Chester's removal as officer and director and his own appointment to the helm instead.  William also requested actual and punitive damages, attorney's fees, and various forms of declaratory and injunctive relief.

¶19.    Soon after filing suit, William amended his complaint to add Kelley as a plaintiff and Carol as a defendant—an apparent response to Chester's taking away Kelley's office-manager duties.  In May 2015, Chester terminated Kelley's position and closed the Virginia office, prompting the other Virginia-based engineer besides William to quit.  Around this same time, William took a job elsewhere too.[5]  Based on A&H's cash-flow problems, Chester had decided not to pay William his employee salary until their client paid on the contract. Chester justified this move as his simply requiring William to bear some of the burden of company ownership.[6]

---

[5] Despite resigning his employment with A&H, William still had to ensure A&H fulfilled its contractual obligations, which is why he was performing work on behalf of A&H and could not attend the July 2014 shareholder meeting.

[6] Apparently, Chester had been floating A&H during the lag between paying its employees and receiving payment from SENTEL for the work performed.  After the lawsuit commenced, Chester made an official cash call on the shareholders.  When William refused, Chester decided not to pay William until after his (Chester's) loan to A&H had been repaid.

7

¶20.    A five-day bench trial was held sporadically over the course of a year, beginning in September 2016 and ending in October 2017.  In April 2018, the chancellor entered his ruling.  The chancellor granted some but not all of the Boatrights' requests.

¶21.    The chancellor ruled in William's favor on his derivative action and his direct freeze-out action.  He also found Chester had frozen out Kelley "from her position at A&H."  The chancellor awarded no compensatory damages but did hold a separate punitive-damages hearing.  After this hearing, Chester was ordered to pay $10,000 to the Boatrights for his "reprehensible" behavior.

¶22.    The chancellor found dissolution was not feasible given that the company's main asset was its long-term contract with SENTEL.  So instead of dissolution, the chancellor ordered a stock transfer from Chester to William so that each became 50% owner of A&H.  The chancellor also ordered that William be rehired and that A&H retain a corporate attorney and certified public accountant.  But the chancellor did not order that Kelley be rehired.  Instead, the chancellor directed that Chester and William, as 50/50 owners, make all hiring and firing decisions together.

¶23.    The chancellor ordered Chester to reimburse A&H $5,260.50 "for expenses not related to the business."  The chancellor also awarded the Boatrights $200,000 in attorney's fees to be paid by A&H based on William's successful derivative action, which the chancellor found benefitted A&H.  *See* Miss. Code Ann. § 79-4-7.46 (Rev. 2013).

¶24.    The chancellor also found the 2008 shareholder resolution to be a valid and enforceable contract that could not be unilaterally revoked.  But he did not grant William's

8

request for specific performance or otherwise remove Chester as president and replace William in that role. Finally, the chancellor denied William's claim for a constructive trust.

## Discussion

¶25. Both parties appealed.[7] Between the direct appeal and cross-appeal, almost every aspect of the chancellor's judgment has been challenged. After a brief discussion on the standard of review, which looms large in this appeal, we first address the claims on which William prevailed (his derivative and corporate freeze-out actions), followed by the claims the chancellor denied (removal of Chester as officer and director, specific performance, and constructive trust). Finally, we consider the chancellor's remedies (stock transfer, damages, attorney's fees, and reimbursement).

### I. Standard of Review

¶26. While the standard of review directs our consideration of every appeal, the required deferential standard of review is particularly important here, where there is little glaring legal error, but instead much disappointment and disagreement on both sides with the chancellor's discretionary decisions.

¶27. This Court reviews the chancellor's decision for abuse of discretion. *Scafidi v. Hille*, 180 So. 3d 634, 645 (Miss. 2015). This means that, while we review legal determinations de novo, we analyze factual determinations for manifest error and will not disturb them if

---

[7] For simplicity, this opinion refers to the appellants, William and Kelley Boatright, collectively as "William"—except where the distinction is made between William and Kelley's individual claims. And this opinion refers to the appellees, A&H and Chester and Carol Abbott collectively as "Chester."

they are supported by substantial evidence. *Id.* at 645-46. Because of this deferential standard, we affirm the chancellor's judgment with three exceptions.[8]

¶28. Clearly, both owners seek control over A&H to the exclusion of the other. With corporate dissolution and division of A&H's main asset—the years-long naval subcontract—not feasible, the chancellor crafted a remedy that prevented Chester from abusing his 51% ownership but at the same time did not oust him from the company he built. While the chancellor's 50/50 ownership and management decision may make both men unhappy, it is not an abuse of discretion.

## II. Prevailing Claims

¶29. In his complaint, William brought both a derivative action and a direct action.

¶30. A derivative action seeks recovery for injuries to the corporation. *Mathis v. ERA Franchise Sys., Inc.*, 25 So. 3d 298, 303 (Miss. 2009). While brought by a shareholder, the action is brought on behalf of and belongs to the corporation, with the shareholder's rights being merely derivative. *Id.* at 301. In his derivative action, William alleged that Chester breached his fiduciary duties as officer and director, injuring A&H by the actions Chester took against William. *See Derouen v. Murray*, 604 So. 2d 1086, 1092 (Miss. 1992) (citing *Fought v. Morris*, 543 So. 2d 167, 171 (Miss. 1989); *Ellzey v. Fyr-Pruf, Inc.*, 376 So. 2d 1328, 1332 (Miss. 1979)).

---

[8] We find the chancellor erred by: (1) finding Chester froze out Kelley, a non-shareholder (*see* Section II.B), (2) awarding punitive damages in the absence of actual damages (*see* Section IV.B), and (3) ordering Chester to reimburse A&H $1,000 for a corporate donation (*see* Section IV.D).

10

¶31. A direct action, by contrast, seeks "to redress an injury sustained by, or enforce a duty owed to, the [share]holder." *Mathis*, 25 So. 3d at 303 (quoting Am. Law Inst., *Principles of Governance* § 7.01). The shareholder brings the action in his or her individual capacity. The action may be maintained without showing any injury or breach of duty owed to the corporation. *Id.* In his direct action, William alleged Chester breached the duties he owed William as fellow shareholder in a closely held corporation by trying to freeze William out. *See Fought*, 543 So. 2d at 171.

¶32. The chancellor found in favor of William on both claims. And Chester cross-appeals both rulings.

### A. Derivative Action

¶33. Chester first challenges the finding that William had brought a valid derivative action. Derivative actions are governed by Mississippi Code Sections 79-4-7.40 through 79-4-7.48 (Rev. 2013), which "impress[] upon derivative actions certain pre-trial procedural requisites over and above the norm." *Derouen*, 604 So. 2d at 1091 (citing Miss. Code Ann. § 79-4-7.40 (Rev. 1989)). The chancellor found William had met all the statutory requirements to bring a derivative action, and Chester does not quibble with this finding. Rather, Chester asserts that William's derivative action was "invalid" because William's lawsuit resulted in no benefit to A&H and, further, that William failed to prove Chester engaged in any gross mismanagement of the company.

¶34. Chester's actions beginning in 2012 were open to interpretation. Chester had argued to the chancellor at trial—and now argues to this Court on cross-appeal—that he made

11

legitimate, good-faith business decisions based on A&H's cash-flow problems and William's recalcitrance. But the chancellor—whose role it was as fact finder to interpret Chester's actions—took a dimmer view and found Chester had harmed A&H in the process. And the record supports the chancellor's interpretation of the facts. For example, Chester's closing the Virginia office to stop paying the Boatrights rent led an A&H engineer to quit, thereby reducing the revenue this engineer generated for A&H. It also meant the loss of Kelley as an FSO, potentially creating security problems. The same is true for Chester's decision not to pay William during the cash-flow shortage. William had to start working elsewhere, impacting A&H's ability to fulfill its contractual obligations. In all, there is record evidence to support the chancellor's determination that Chester, in his personal anger toward William and his disdain for being called "greedy," violated his duty of good faith and care to act in the best interest of A&H and in doing so jeopardized A&H as a going concern. *See **id.*** at 1092 (explaining the corporate duty of care); *see also* Miss. Code Ann. § 79-4-8.30 (Rev. 2013) (imposing on a corporate director the duty to act in good faith and in the corporation's best interest).

¶35. While Chester insists there was no evidence of mismanagement on his part during the contentious period immediately before and after William filed this lawsuit—asserting rather all his decisions were valid business decisions necessitated by *William's* actions—the chancellor found Chester was in the wrong. And we can find no manifest error in his determination.

### B. Freeze Out

12

¶36.   Chester next challenges the chancellor's freeze-out determination.

¶37.   Owning a controlling majority of A&H shares did not allow Chester to make any decision he wanted. Because A&H is a closely held corporation, the law required that majority owner Chester act "intrinsically fair" toward minority owner William. *Fought*, 543 So. 2d at 170. Our law recognizes that "[m]inority shareholders in closely held corporations are particularly vulnerable, because they usually lack the control the majority has and there is seldom a fair market available for selling their shares." *Brothers v. Winstead*, 129 So. 3d 906, 918 (Miss. 2014) (citing *Fought*, 543 So. 2d at 170). So, "if a dispute arises between the minority member and the majority, it is usually the case that a 'minority shareholder can neither profitably leave, nor safely stay with, the corporation.'" *Id.* (quoting *Fought*, 543 So. 2d at 171). The freeze-out action redresses the problem that arises when "the majority, through its right of control, intentionally reduces or eliminates the minority shareholder's right to corporate earnings or gains," but the minority member is unable to withdraw or sell. *Id.* at 918.

¶38.   A freeze-out action has four elements—"(1) the existence of a legally defined duty owed to or right of a minority shareholder arising out of his or her ownership interest in a corporation; (2) the intentional or willful breach of that duty by the majority or controlling shareholder(s); (3) that the breach proximately caused plaintiff's direct injury; and (4) the fact and extent of injury." *Id.* at 919. Concerning the freeze-out claim, the chancellor clearly erred when he found that Chester engaged in a freeze out of *Kelley* as well as William. Because Kelley is not a shareholder, she could not be frozen out. And Chester owed her no

13

duties based on ownership interest in A&H.[9]  *See **id.***  So we reverse and render the chancellor's freeze-out ruling to the extent it found Kelley too had been frozen out.  That said, the evidence shows that both men derived a significant amount of compensation as owners through the employment income of their wives.  Thus, there was no reversible error in the chancellor's considering Chester's actions toward Kelley as evidence of Chester's freeze out of William.

¶39.    Turning to William's freeze-out claim, "[i]n its most classic form, a freeze-out of the minority shareholders by the majority occurs when the majority purposefully denies the minority member from sharing proportionally in corporate earnings or gains."  ***Id.*** at 918.  On cross-appeal, Chester argues there could be no freeze out because A&H awarded no corporate dividends.  But the record shows, for tax purposes, A&H purposefully made no corporate income.  Instead, both owners enjoyed the prosperity of A&H through both their own salaries and their wives' salaries.  Thus, the chancellor reasonably concluded that, by reducing and then eliminating Kelley's salary and then later not paying William, Chester had engaged in a freeze out of William.

¶40.    Chester further contends that by not paying William, Chester pulled off the opposite of a freeze out.  He claims he was instead treating William as an owner who should have responded to Chester's cash call when A&H was waiting to be paid.  In his view, William voluntarily resigned.  Chester further contends that his decision to close the Virginia office was a cost-saving measure made in response to having to defend the lawsuit.  Again, the

---

[9] Moreover, in the amended complaint, William alone brought the freeze-out claim.

14

chancellor viewed Chester's actions differently—as a willful breach of Chester's duty to William as minority shareholder, which injured William. As with the derivative claim, there is record evidence to support the chancellor's freeze-out determination. In particular, closing the Virginia office cost the Boatrights their health insurance, which they needed to maintain because of their daughter's preexisting condition.

¶41. With the exception of correcting the erroneous finding that Kelley also had been frozen out, we do not disturb the chancellor's freeze-out finding.

### III. Denied Requests

¶42. William's complaint also sought other claims for relief that were denied, which he appeals.

#### A. Chester's Removal

¶43. First and foremost, William complains the chancellor erred by not removing Chester as A&H's director. Tied to this claim is William's assertion that both he and Kelley should have been restored as officers and Kelley should have been restored as employee.

¶44. Under Mississippi Code Section 79-4-8.09(a) (Rev. 2013),

> The chancery court . . . may remove a director of the corporation from office in a proceeding commenced either by the corporation or by its shareholders holding at least ten percent (10%) of the outstanding shares of any class if the court finds that (1) the director engaged in fraudulent or dishonest conduct, or gross abuse of authority or discretion, with respect to the corporation, and (2) removal is in the best interest of the corporation.

The chancellor agreed with William that Chester's actions rose to the level required by Section 79-4-8.09(a)(1). The chancellor found Chester had acted reprehensibly toward William in his attempt to freeze him out. The chancellor also, in ruling in favor of William's

15

derivative action, found that Chester's actions had harmed the corporation. But the chancellor stopped short of finding Chester's removal was in the best interest of A&H—the second requirement of Section 79-4-8.09(a). Instead of ousting Chester, the chancellor found A&H would be better served by checking Chester through equal ownership with William.

¶45. Based on the "may" language of Section 79-4-8.09(a), this was a discretionary call for the chancellor to make. And we affirm his decision on appeal. From his judgment, it is clear the chancellor intended co-management of A&H, as opposed to *sole* management by either Chester or William. Now, William will have equal voting power about who will serve as corporate officers and whom the corporation will hire. While William asked for sole decision-making authority, we find no abuse of discretion in the chancellor's determination that neither owner should be allowed exclusive control.

### B. Specific Performance

¶46. Section 79-4-8.09(a) was not the only means by which William sought Chester's removal. William brought a breach-of-contract claim based on the 2008 shareholder resolutions—the resolutions Chester unilaterally revoked in 2014 after voting himself sole director. William sought specific performance of the third resolution, in which both men had resolved that "[u]pon health conditions which would render Chester Abbott unable to make informed decisions as president and majority stockholder in the management of the corporation William Boatright will assume the office of President and its responsibilities." While the chancellor found the resolutions formed a valid and enforceable contract that could

16

not have been unilaterally revoked by Chester six years later, the chancellor declined to order the specific performance of presidency-assumption resolution.

¶47. Both parties take issue with the chancellor's resolution-related ruling. William appeals the denial of his claim for specific performance. And Chester cross-appeals the finding the resolutions formed a contract. Because William's specific performance claim fails regardless of whether a contract existed, there is no reason to disturb these findings.

¶48. Specific performance is an equitable remedy for breach of contract. ***Bus. Commc'ns, Inc. v. Banks***, 90 So. 3d 1221, 1225 (Miss. 2012). And to prove breach of contract, William had to show not only the existence of a contract but also that Chester breached it. ***Id.*** At trial, William failed to prove the triggering event to Chester's stepping down as president—that Chester had a health condition that rendered him unable to make informed decisions. While Chester may be advancing in age, this is hardly record proof that the circumstance both men anticipated in 2008 would lead to William's taking over had occurred. So the denial of specific performance was not manifest error.

### C. Constructive Trust

¶49. William raises one final issue on appeal in an attempt to steer control of A&H. He claims the chancellor erred by not granting him a constructive trust of 5% or 118 of the shares James Hawkins transferred to Chester in 2005. William argues that he was entitled to those shares under the 1998 shareholder agreement between Chester and James, which by its terms also applied to any person to whom shares were transferred. William reasons that,

when the 118 shares are added to the other 2,450 shares James and Chester had given him, it is *he* and not Chester who is 51% majority shareholder.

¶50.   On appeal, there is no reason to disturb the chancellor's denial of a constructive trust.

¶51.   "The mere failure to perform an agreement does not raise a constructive trust . . . ." ***Saulsberry v. Saulsberry***, 223 Miss. 684, 690, 78 So. 2d 758, 760 (1955).  A constructive trust is a remedy for unjust enrichment, the fraudulent obtainment of property.  ***Id.***  And the law recognizes the distinction "between the breach of a promise not fraudulently made and the breach of a promise made with no intention of performing it."  ***Id.***  Only the latter can form the basis for a constructive trust.  ***Id.***

¶52.   Chester maintained that, because he and James were dissolving their partnership, the 1998 shareholder agreement would no longer be in effect—especially as a benefit to William, who never signed it.  While Chester may have been mistaken about the legal effect of the shareholder agreement, there is no evidence he committed fraud.

¶53.   There is also no evidence that Chester held on to property rightfully belonging to William.  *See id.*  While William did not receive 5% or 118 of James's shares *directly* from James when he left A&H in 2005, over the course of the next seven years, William was given 2,200 or 93% of James's former shares.  So any violation of the 1998 shareholder agreement in 2005 had been remedied almost twenty times over by the time William asserted his constructive-trust claim in 2014.[10]

---

[10] A constructive-trust claim, if purely equitable, has a ten-year statute of limitations. Miss. Code Ann. § 15-1-39 (Rev. 2019); *see also* ***Hooker v. Greer***, 81 So. 3d 1103, 1110 (Miss. 2012).  For this reason, William asserted his constructive-trust claim was timely, and Chester did not raise a statute-of-limitations defense.

¶54. Had William received 118 shares in 2004 in accordance with the 1998 shareholder agreement, there is simply no support for his argument that he would have been the majority shareholder by 2014. The record makes absolutely clear that Chester's intention was that he (Chester) remain majority shareholder, so it is safe to assume that Chester would have factored in William's additional 118 shares when transferring just enough shares in 2014 to make William 49% owner. So the chancellor did not abuse his discretion by denying William's constructive-trust claim, advanced as a means of becoming majority shareholder.

### IV. Remedies

¶55. Finally, both sides appeal and cross-appeal several remedy-related rulings.

### A. Stock Transfer

¶56. The main remedy awarded William was equal ownership of A&H.

¶57. As alternative relief to becoming majority shareholder and president, William requested A&H be dissolved.[11] *See Scafidi*, 180 So. 3d at 650 (holding that a claim to compel the shareholders dissolve the corporation is a direct action). But the chancellor found dissolution unfeasible, given that A&H's major asset—its contract with SENTEL—could not be liquidated and divided. So the chancellor crafted the alternative remedy that Chester and William should equally own and manage A&H.

¶58. On cross-appeal, Chester argues the chancellor erred by awarding William 50% ownership instead of dissolving the company. He acknowledges that, under Mississippi law, "a chancellor does not have to order a dissolution, even if grounds such as oppression or

---

[11] By motion, Chester had also requested A&H be dissolved.

deadlock are met."[12]  *Id.* at 652.  "This is because the general view in Mississippi is that 'dissolution is an extraordinary remedy to be sparingly administered in exceptional cases only.'"  *Id.* (quoting *Capitol Toyota, Inc. v. Gervin*, 381 So. 2d 1038, 1039 (Miss. 1980)). "[T]he more common relief in modern cases is to provide relief alternative to dissolution." *Id.* (quoting F.H. O'Neal & R. Thompson, *O'Neal's Close Corporations* § 9.25 (3d ed. 1971)); *see also* Miss. Code Ann. § 79-4-14.34(i) (Rev. 2013) ("Nothing contained in this section shall diminish the inherent equity powers of the court to fashion alternative remedies to judicial dissolution.").  And in *Scafidi*, this Court listed among "several remedies available for oppressive conduct as an alternative to dissolution" the transfer of stock "'to achieve a 50/50 balance or some other ownership structure fair to the shareholders . . . .'"  *Id.* at 653-54 (quoting *O'Neal's Close Corporations* § 9.35).

¶59.   Still, Chester challenges this alternative remedy for two reasons.  First, he asserts the facts of *Scafidi* were substantially different than these.  In that case, a feuding brother and sister owned an equal amount of shares in a corporation until the brother used corporate funds to purchase minority shares and become majority shareholder.  *Id.* at 640, 643. The chancellor ordered the brother to transfer half of the newly purchased shares to his sister to restore equal ownership.  *Id.* at 643-44.  Here, by contrast, Chester asserts, William has always been a minority shareholder, having received all his shares as a gift.  While the facts are indeed different, *Scafidi* makes clear that the chancellor had authority to order the

---

[12] Mississippi Code Section 79-4-14.30(2) (Rev. 2013) authorizes the chancery court to dissolve a corporation if a shareholder establishes, among other things, hopeless deadlock or oppressive conduct by the corporate directors.

transfer of shares from Chester to William to achieve 50/50 ownership as a remedy for Chester's oppressive conduct. *Id.*

¶60. Second, Chester argues this remedy—coupled with the unnecessary and expensive requirements that A&H hire a corporate attorney and accountant—will only lead to deadlock. Given what has happened in the past, Chester may prove to be right. But the only alternative route Chester suggests the chancellor should have followed was that Chester retain his 51% ownership and management control, which the chancellor found untenable due to Chester's oppressive conduct.

¶61. Because the record supported the chancellor's finding Chester had engaged in oppressive conduct sufficient to warrant corporate dissolution and because the chancellor did not exceed his authority by ordering 50/50 ownership as an alternative remedy to dissolution, we do not disturb this central aspect of the chancellor's judgment.

### B. Damages

¶62. We do, however, reverse and remand the award of damages—or lack thereof.

¶63. The chancellor found Chester had engaged in a freeze out of William and Kelley. Yet he awarded no monetary damages, except $10,000 in punitive damages based on Chester's "reprehensible" conduct. But as Chester rightly asserts on cross-appeal, without actual damages, punitive damages are not recoverable. *Jenkins v. CST Timber Co.*, 761 So. 2d 177, 180 (Miss. 2000) (holding "punitive damages are not recoverable if no actual damages are allowed"). Under Mississippi Code Section 11-1-65(c) (Rev. 2019), punitive damages

21

may only be considered "[i]f, but only if, an award of compensatory damages has been made against a party . . . ."

¶64. Here, the chancellor expressly awarded punitive damages due to Chester's freeze-out actions and only did so after reviewing Section 11-1-65 and holding a special hearing. Thus, it appears the chancellor determined punitive damages were available under Section 11-1-65(c). This raises the question whether the chancellor mistakenly believed punitive damages were available because William had been "compensated" for his freeze-out action through the equitable remedy of the stock transfer. But as already discussed, the remedy awarded—equal ownership—is an alternative remedy for a dissolution claim. By contrast, the remedy for a freeze out is *legal*, in the form of damages to compensate the personal injury to the minority shareholder. *Brothers*, 129 So. 3d at 923-24. So despite finding the elements of a freeze out had been proved—including "the fact and extent of injury"—the chancellor awarded no compensatory damages. *Id.* at 919.

¶65. We note that the chancellor in *Scafidi* crafted the very same remedy—he awarded equal ownership as an alternative to corporate dissolution but did not award the sister any damages for the intentional tort of corporate freeze out. *Scafidi*, 180 So. 3d at 655. But in that case, the sister did not appeal the lack of a damages award, whereas here William does. William claims the lack of money damage is insufficient, primarily because *Kelley* was not compensated for her lost wages. But as already discussed, the chancellor erred by ruling that Chester had engaged in a freeze out of Kelley because Kelley was not an owner. She was an at-will employee, who did not bring—and could not bring under Mississippi law—an

22

action for wrongful termination. So she has no direct right to recover damages for her alleged injury. To the extent William argues he was not adequately awarded monetary damages for the injuries to *him* for the freeze out, which may have included Kelley's lost compensation as well as the consequential damages flowing from the closing of the Virginia office, this Court reviews the lack of damages award for abuse of discretion. *Lane v. Lampkin*, 175 So. 3d 1222, 1227 (Miss. 2015). In so doing, we find the chancellor abused his discretion when he went straight to punitive damages without first awarding actual damages.

¶66. For this reason, we reverse and remand the issue of damages—both actual and punitive—as they relate to William's successful freeze-out claim. Clearly, the chancellor found Chester's breach of fiduciary duty as the majority shareholder warranted punitive damages. *See Fought*, 543 So. 2d at 173 (noting that breach of fiduciary duty is one of the "extreme or a special additional circumstance when punitive damages may be awarded" (quoting *U.S. For Use and Benefit of Control Sys., Inc. v. Arundel Corp.*, 814 F.2d 193, 199 (5th Cir. 1987))). But he erred by finding the equitable remedy awarded formed the necessary predicate to punitive damages under Section 11-1-65(c). On remand, the chancellor should consider if any actual damages should be awarded based on Chester's freeze out of William (but not Kelley) and, if so, if punitive damages are still appropriate.

### C. Attorney's Fees

¶67. While awarding no damages for the freeze out, the chancellor did award William $200,000 in attorney's fees to be paid by A&H. Both William and Chester have appealed.

23

William asserts the $200,000 amount was insufficient. And both parties argue A&H should not have been ordered to pay.

¶68. As to the amount, this Court has expressed its reluctance to disturb the chancellor's determination of what is an appropriate amount of attorney's fees. *Smith v. Smith*, 614 So. 2d 394, 398 (Miss. 1993). So we will not disturb the $200,000 amount. While William claims it was not enough, it was certainly not nothing.

¶69. As to A&H's being ordered to pay, the chancellor based his directive on Mississippi Code Section 79-4-7.46(1) (Rev. 2013). This statute authorizes that, "[o]n termination of the derivative proceeding the court may . . . [o]rder the corporation to pay the plaintiff's reasonable expenses (including attorney's fees) incurred in the proceeding if it finds that the proceeding has resulted in a substantial benefit to the corporation." *Id.* Here, the chancellor expressly found that William's derivative action resulted in a substantial benefit to A&H. On cross-appeal, Chester challenges the attorney's fees award for the same reason he argues William's derivative action was not valid—he claims William's action resulted in no benefit to A&H. But as discussed above, the chancellor's finding that William's derivative action benefitted A&H was supported by the record.

¶70. William also challenges the chancellor's application of Section 79-4-7.46(1), but for a different reason. He asserts the statute is discretionary and not mandatory. So even though William was successful in the derivative action, he emphasizes A&H did not *have* to pay his attorney's fees under the statute. Instead, William asserts, the chancellor should have required Chester to pay *individually* based on his willful actions, which supported the

24

chancellor's punitive-damages finding. *See **Aqua-Culture Techs., Ltd. v. Holly***, 677 So. 2d 171, 184-85 (Miss. 1996) (holding that a trial court may validly award attorney's fees based on a finding punitive damages would be appropriate, even when no punitive damage are awarded). If we have followed his argument correctly, William is arguing the chancellor abused his discretion by choosing one available avenue of attorney's fees over another available avenue. But having available options is the essence of discretion. William does not argue Section 79-4-7.46(1) could not apply based on the chancellor's finding. He simply argues Section 79-4-7.46(1) should not apply because Chester could have been ordered to pay the attorney's fees instead.

¶71. Because the chancellor would have been within his discretion to award no attorney's fees at all, we refuse to second-guess the chancellor in this regard but instead affirm the attorney's fees award, including the order that A&H must pay, on both appeal and cross-appeal.

### D. *Corporate Reimbursement*

¶72. Finally, Chester cross-appeals the order that he reimburse A&H $5,260.50, which represents $1,000 he directed Kelley to donate to 4H and $4,260.50 he spent on a thermal camera.

¶73. We affirm the order to the extent Chester must reimburse A&H for the camera. The chancellor heard conflicting evidence about *why* Chester purchased the camera with A&H funds. While Chester testified the camera served a legitimate business purpose, William

25

claimed Chester bought it for recreational hunting. As with much of the other conflicting evidence, the chancellor believed William over Chester, which was within his discretion.

¶74. But we reverse the order the extent it requires Chester to reimburse A&H for the 4H donation. Like the camera, the chancellor deemed the donation was an "expense[] not related to the business." But under Mississippi Code Section 79-4-3.02(13) (Rev. 2013), every corporation has the power to "[t]o make donations for the public welfare or for charitable, scientific or educational purposes . . . ." So by directing the donation, Chester in his role as sole director was exercising a legitimate corporate power. While William, as 49% shareholder may have preferred A&H direct its generosity elsewhere, we fail to see on what authority the chancellor could order that Chester was personally liable for this amount. While the record does indicate Chester in the past had also made additional corporate donations without consulting William, the evidence is not substantial enough to support a finding that the 4H donation was a personal expense.

**Conclusion**

¶75. On appeal, we affirm the chancellor's denial of Chester's removal as president and director, the denial of specific performance, and the denial of a constructive trust. We also also affirm the $200,000 attorney's fees award assessed against A&H. But we reverse the zero actual-damages award for the freeze out of William and remand this issue to the chancellor to be considered along with punitive damages.

¶76. On cross-appeal, we affirm the chancellor's finding that William brought a valid derivative action and that Chester had engaged in a corporate freeze out of William, but we

26

reverse and render the finding Kelley was also frozen out. We also reverse and render the order to reimburse A&H the $1,000 4H donation. We reverse and remand the punitive-damages award based on the freeze out. And, as on appeal, we affirm the chancellor's attorney's fees award, assessed against A&H based on William's derivative action. Finally, and most important, we affirm the chancellor's decision that 50/50 ownership was a preferable remedy to corporate dissolution.

¶77. **ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART. ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART; REVERSED AND RENDERED IN PART.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**