# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-01408-COA

| | |
|---|---|
| **WENDELIN COLSON, INDIVIDUALLY, AND FOR THE USE AND BENEFIT OF MEDECON, LLC** | **APPELLANT/ CROSS-APPELLEE** |

**v.**

| | |
|---|---|
| **DAWN WARREN** | **APPELLEE/ CROSS-APPELLANT** |

| | |
|---|---|
| DATE OF JUDGMENT: | 05/18/2021 |
| TRIAL JUDGE: | HON. WILLIAM H. SINGLETARY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | PAUL E. ROGERS |
| ATTORNEYS FOR APPELLEE: | PHILLIP BUFFINGTON |
| | TIMOTHY JAMES ANZENBERGER |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL: AFFIRMED - 03/21/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.	This case involves a two-person limited liability company and whether it should be dissolved.  Its sole asset was a building that was rented to another company.  The LLC had the potential to make money from the rent, but it did not have a bank account; it had accrued over $99,000 in undeposited checks.  The two owners were split on how the company should proceed; one wanted to dissolve it, while the other wanted to open a bank account, cash the checks, and continue doing business.

¶2.	The trial court refused to dissolve the company and, in balancing the equities, found

that the two members should cooperate on opening a bank account and drafting and implementing an operating agreement. One member appealed, and the other cross-appealed. Finding the trial court's decisions were within its discretion, we affirm.

**BACKGROUND**

¶3. In 2003, Dawn Warren and Wendy Colson purchased a corporation called Durfold, which manufactures furnishings for the healthcare environment, including reclining chairs and bariatric furniture. Wendy and Dawn are sisters-in-law. When they bought Durfold, they each owned 50%.

¶4. The purchase of Durfold included a building and real property at 102 Upton Drive in Jackson. The building serves as a combination office, manufacturing plant, and warehouse for Durfold. The same year of the purchase, Wendy and Dawn created a separate company, Medecon, which was set up as a two-member LLC. The building and real property at 102 Upton Drive were deeded to the new LLC.

¶5. The concept was that Durfold would then pay rent to Medecon, generating a different income stream and lowering the owners' tax burdens, as the rent payments could be deducted as business expenses. If the sisters-in-law chose to sell Durfold, the building now owned by Medecon could also serve as an investment vehicle or generate rental income from another company. There was originally a written lease between the two companies, but for many years, Durfold did not actually write checks to Medecon for rent.

¶6. After a period of time, the relationship of the two owners fell apart. After mediation, and pursuant to a settlement agreement, Dawn bought out Wendy's interest in Durfold in the

2

process becoming its 100% owner.

¶7.     But Medecon was not addressed in this mediation.  The LLC was still owned by Dawn and Wendy, who no longer communicated except through lawyers and their CPA.  Durfold still occupied Medecon's building.

¶8.     Durfold began to write monthly checks pursuant to the now-expired lease to Medecon. Each month, a check in the amount of $2,750.54 was cut but not deposited.  Because there was a problem: Medecon did not have a bank account, and neither of its two members would reach out to the other to set one up.  Tens of thousands of dollars in potential revenue to Medecon were beyond the reach of the two members because the checks could not be cashed.

¶9.     But because Durfold was claiming the rent checks it was writing were subject to a deduction from taxable income, the two owners of Medecon were facing the reality that they had to pay taxes on money that did not actually reach their pockets since there was no bank account to receive the funds.

**PROCEDURAL HISTORY**

¶10.    Wendy, becoming frustrated that she was still nominally in business with her former partner in Durfold, filed a lawsuit to judicially dissolve Medecon.  In her complaint, she alleged that "Medecon, LLC was established for the acquisition and management of real estate."  She argued that Dawn had "abused her authority in the management and operation of Medecon, LLC" and that it was no longer "reasonably practicable to continue to carry on the business[.]"  She requested attorney's fees and "pray[ed] for such further or additional relief as is proper in the premises including an award of attorney fees."

3

¶11.    By the time of trial, the uncashed checks from Durfold to Medecon spanned thirty-six months, totaling $99,019.  Dawn, as full owner of Durfold, testified under oath the full amount was set aside, and the checks could be cashed immediately.

¶12.    During trial, Dawn explained Medecon did not have a bank account because she did not feel like she should open one as only a part owner.  While Wendy would dispute this, Dawn claimed that at one point Durfold had business troubles because Wendy had unilaterally opened a business account.

¶13.    Crucially, Dawn agreed that she was willing to open a bank account for Medecon and deposit the nearly $100,000 in checks from Durfold.  She also believed that if that were to happen, then she would be amenable to Medecon continuing as a company.  She was willing to work with Wendy again on that business—and in any event, Medecon did not have any other business besides collecting rent from Durfold and then disbursing the money to its two partners.

¶14.    In contrast, Wendy wanted out of Medecon.  She told the trial court, "I had hoped that since we were separating with Durfold that we would be able to separate with Medecon . . . because obviously if we could not be in business together with our manufacturing corporation, it didn't seem fair or right to even be in business together with Medecon."  She was frustrated because she was paying taxes on money she never received, as Durfold was reporting the rental payments as a deduction.

¶15.    She said Dawn had never suggested they open a bank account for Medecon, but the trial court also heard that the two had not really spoken to each other outside of email for

4

nearly a decade. According to Wendy, if she had heard from her partner, Wendy would have opened the bank account and cashed the checks.

¶16. Ultimately, Wendy asked the trial court to dissolve the LLC, expressing she "would love for [Durfold] to buy me out," but in any event she wanted to "put [the building] up for sale and separate."

¶17. Both Durfold and Medecon used the same certified public accountant, Cathy Slocum. The CPA testified she had been with the companies since their inception in 2003. She explained that Medecon was set up to provide passive income to Dawn and Wendy, but at this point it was a bit of a zombie; she testified, "I don't know that anybody controls day-to-day operations of Medecon[.]" The whole point of the LLC was just to rent the building at 102 Upton Drive.

¶18. After hearing from the two members of the LLC and the CPA, the parties rested. The trial court issued a concise order finding "that the very limited economic purpose for which Medecon was formed can rather easily continue to be met without dissolution." Accordingly, since the LLC did not meet the "extreme remedy" of dissolution, the trial court refused to grant that relief to Wendy.

¶19. Yet the trial court recognized Wendy had plead other relief in addition to dissolution, and recognizing that "[t]he chancery court is a court of equity," the trial court found it essentially took her filing a lawsuit to obtain "her portion of the monthly rent" from Durfold: "Although Dawn contended that she could never obtain Wendy's cooperation to establish a bank account for Medecon, LLC, she nevertheless in her testimony at trial also

acknowledged never having made an attempt to establish such bank account." The trial court found that "[a]t best it would appear that such failure amounted to a standoff between the parties, but it was a stalemate that benefitted Dawn" since Durfold was now under her total control.

¶20. So the trial court ordered the two members open an account at a bank picked by their CPA, "and the parties are hereby specifically ordered to cooperate in whatever way required for the establishment of such account." Then, the CPA was to deposit the checks and figure out the financial ramifications faced by Medecon's two members.

¶21. Relatedly, the trial court took "judicial notice of the fact that in addition to the monthly rental payments, the obligations of the parties under the lease called for Medecon, LLC, to pay the taxes assessed against the property," but instead they had been paid by Durfold. The trial court determined that "[n]o evidence was introduced regarding the amount of taxes incurred by [Durfold] during the three years the parties failed to comply with the terms of the lease, and no evidence of the amount of attorney fees incurred by Wendy was introduced."

¶22. The trial court made a finding "that in equity such amounts should be considered to effectively offset, so that Wendy should be relieved of any responsibility as fifty percent (50%) owners of Medecon, LLC, for real property taxes assessed" against the 102 Upton Drive building for 2018 through 2020. Given this offset, the trial court found "the equities of the parties are considered balanced" regarding the property taxes "and as to Wendy's entitlement to an award of attorney's fees."

6

¶23. Since Medecon would continue existing, and in order to avoid another breakdown in communication, the trial court held, "[I]t will be essential in the future for these parties to have [the] benefit of a formal operating agreement for Medecon, LLC," and accordingly the two members were "ordered to immediately retain counsel to negotiate and draft an operating agreement between them, such agreement to be executed by the parties and in place within sixty (60) days" from the trial court's order.

¶24. Both sides appealed some components of the trial court's judgment.

## STANDARD OF REVIEW

¶25. "On appeals from chancery court, this Court employs a limited standard of review." *Venture Sales LLC v. Perkins*, 86 So. 3d 910, 913 (¶11) (Miss. 2012). "We review a chancellor's decision for abuse of discretion." *Id*. "This Court will affirm a chancellor's decision when it is supported by substantial credible evidence." *Id*. "Questions of law are reviewed de novo." *Id*.

## DISCUSSION

### I.     The trial court was within its discretion to deny the dissolution of the LLC.

¶26. On appeal, Wendy argues in two different ways why the trial court should have ordered the dissolution of Medecon. First, she argues the trial court should have granted dissolution because it was no longer "reasonably practicable" to continue the LLC. In the alternative, she protests the actions of Dawn showed "persistent and pervasive fraud or abuse of authority," which justifies dissolving the company.

¶27. This is really only one question—whether the trial court abused its discretion in

7

denying the request to order the dissolution of Medecon. One case informs and controls this appeal, and it was the same one the trial court applied—the core decision on the mandatory dissolution of an LLC in Mississippi: *Venture Sales*. In that case, a unanimous Supreme Court considered a dispute among partners in Petal. *Venture Sales*, 86 So. 3d at 912 (¶1). One Perkins "owned 27.7 acres of land," and he was approached by two other property owners who proposed to "acquire the 438 acres of land that adjoined Perkins's land to the south; then, the parties would combine their respective land, along with some cash, and form a venture to develop the land." *Id*.

¶28. So they did, and Perkins also brought in over $150,000 in cash to an existing LLC which was restructured to include all three as 1/3 owners. *Id*. "[T]he operating agreement of Venture Sales was revised to reflect the arrangement" and declared that "The purpose of the Company is to initially acquire, develop and sale [sic] commercial and residential properties near Petal, Forrest County, Mississippi[.]" *Id*. at (¶4).

¶29. But in the decade following, Venture Sales did not do much; "the property remained undeveloped and virtually unchanged." *Id*. at 913 (¶6). But at the same time, its original two members separately "developed at least two other subdivisions with approximately 200 collective houses within twenty-five miles of the Venture Sales property." *Id*. Perkins sued to dissolve the LLC, and the trial court granted the request. *Id*.

¶30. On appeal, the Supreme Court first reviewed the statute that authorized dissolution of LLCs, now codified at Mississippi Code Annotated section 79-29-803 (Rev. 2013). The current law establishes that a chancery court "may decree dissolution of a limited liability

8

company" in three scenarios:

(a) Whenever it is not reasonably practicable to carry on the business in conformity with the certificate of formation or the operating agreement;

(b) Whenever the managers or the members in control of the limited liability company have been guilty of or have knowingly countenanced persistent and pervasive fraud or abuse of authority, or the property of the limited liability company is being misapplied or wasted by such persons; or

(c) In a proceeding by the limited liability company to have its voluntary dissolution continued under court supervision.

Miss. Code Ann. § 79-29-803(1). As is partly at issue in this appeal, the matter in question in *Venture Sales* was whether it was "not reasonably practicable to carry on the business in conformity with the certificate of formation or the [operating] agreement." *Venture Sales*, 86 So. 3d at 914 (¶13).

¶31. To resolve this question of first impression, the Court turned to other jurisdictions to find the best approach. *Id*. "Judicial dissolution has been described as a remedy extreme in nature, and one that is to be granted sparingly." *Id*. The purpose of a business did not have to be "completely frustrated" before ordering dissolution, and the remedy of "[d]issolution generally has been deemed appropriate when a company's economic purpose is not being met, or when the company is failing financially." *Id*. "[I]t is clear that when a limited liability company is not meeting the economic purpose for which it was established, dissolution is appropriate." *Id*.

¶32. The Court determined the "economic purpose" of Venture Sales by looking to its operating agreement, which was to acquire, develop, and sell commercial and residential properties. *Id*. at 915 (¶17). But the LLC had done no such thing: one member "admitted

9

that the company was formed for the purpose of acquiring and developing property," but "more than ten years after Venture Sales was formed with Perkins as a member, the property remains completely undeveloped." *Id*.

¶33.    Ultimately, the fact that the business simply did not work weighed heavily into the Court's analysis, and not reasons why it *could* work: "while Venture Sales currently may be solvent, and while the economy may be improving overall, [the two other members] have not shown that Venture Sales can meet the purpose for which it was formed—developing and selling its property." *Id*. at 916 (¶20).  "Rather, Venture Sales has existed for more than ten years and has yet to achieve, or even begin fulfilling, its stated purpose," the Court determined, and accordingly held "that the chancellor did not abuse his discretion by granting the petition for dissolution of Venture Sales." *Id*. at 917 (¶29).

¶34.    Both sides in this case agree *Venture Sales* controls, as the trial court likewise concluded.  The differences between Medecon and the failed property venture in that case are striking.  Both members and their CPA agree that the one purpose of Medecon is to rent out the building at 102 Upton Drive, providing passive income to the two members.  Unlike the failed business in *Venture Sales*, which had never made a dime or developed a square foot of property over almost a decade, Medecon is a successful business.  The LLC has only one asset, its building in Jackson, which is fully rented to a paying tenant, Durfold.

¶35.    In contrast to the LLC in *Venture Sales*, which was supposed to "acquire, develop and [sell]" property, but never actually had, Medecon has fulfilled its agreed-upon purpose to provide passive income to its two members by renting space to Durfold.  The tenant company

10

had written checks totaling over $99,000 to Medecon, and Durfold's sole owner, Dawn, testified the money was in the bank to cover the payments. She also explained that Medecon's building was crucial to Durfold, as it served as a combined warehouse, manufacturing facility, and office.

¶36. The only evidence presented to the trial court of why the business was not operating was the simmering animosity between the partners, which had not only collapsed their joint ownership of Durfold but also their family relationship. Both members of Medecon testified under oath that they would have opened a bank account if the other had agreed and that they wanted to cash the checks that Durfold had been drafting and setting aside.

¶37. On appeal, Wendy argues the trial court could have ordered dissolution under either subsection (a) or (b) of the judicial dissolution statute, Miss. Code Ann. § 79-29-801(1), by first inquiring whether "it is not reasonably practicable to carry on the business in conformity with the certificate of formation or the operating agreement" and second "[w]henever the managers or the members in control of the limited liability company have been guilty of or have knowingly countenanced persistent and pervasive fraud or abuse of authority, or the property of the limited liability company is being misapplied or wasted by such persons[.]" As to the first route, the proof at trial was that Medecon could continue to fulfill its purpose. As to the second, despite Wendy's arguments on appeal, there was simply no proof of "pervasive fraud or abuse of authority," and the only property of Medecon, its building, was being maintained by Durfold.

¶38. The Supreme Court carefully explained in *Venture Sales* that it was within the

11

discretion of the trial court whether to grant the "extreme" remedy of dissolution, and one scenario where it would be appropriate was "when a limited liability company is not meeting the economic purpose for which it was established[.]" *Venture Sales*, 86 So. 3d at 914-15 (¶¶15-16). There is no rule that business partners have to like each other, and with a singular focus and paying tenant, Medecon is meeting the economic purpose for which it was established. We hold it was well within the discretion of the trial court to deny the request to dissolve the LLC.

## II. The trial court was within its discretion to order equitable relief.

¶39. We now turn to Dawn, who also cross-appealed two components of the trial court's order. She does not challenge the order to open a business account for Medecon or to disburse the money. She argues instead that the trial court should not have ordered an "offset [for Wendy's] request for attorney's fees and expenses against [a] potential claim for property taxes and repairs Medecon should have paid under the lease[.]" Dawn also argues the two members of the LLC should not have "to negotiate and enter into a written operating agreement."

¶40. In response, Wendy argues that "[t]he Chancery Court was within its general equitable powers" to grant the offset and that "[r]equiring the parties to enter into an operating agreement falls under the chancery court's inherent equitable power and authority."

¶41. "A court of equity is a court of conscience," our Supreme Court has held. *In re Est. of Flowers*, 264 So. 3d 775, 779 (¶16) (Miss. 2019). "The function of the chancellor is, upon equitable considerations, to winnow the wheat from the straw, and his decree will not be set

12

aside on appeal unless, as is not the case here, it is made to appear that it is not equitable but inequitable to let it stand." *Id*. Accordingly, "[t]he chancery court must have considerable discretion in fashioning that remedy to the equities of the case presented." *Jones Cnty. Sch. Dist. v. Covington Cnty. Sch. Dist.*, 352 So. 3d 1123, 1133 (¶29) (Miss. 2022).

¶42. The statute governing judicial dissolution of an LLC expressly declares that "[n]othing contained in this section shall diminish the inherent equity powers of the court to fashion alternative remedies to judicial dissolution." Miss. Code Ann. § 79-29-805(3). By use of this language, the Legislature recognized the longstanding ability of our chancery courts to balance the interests of parties and find a middle path, which is why our jurisprudence features the maxim "Equity will not suffer a wrong without a remedy[.]" *Emmons v. Emmons*, 217 Miss. 594, 600, 64 So. 2d 753, 755 (1953).

¶43. Ruling in terms of a corporation, not an LLC, the Supreme Court has held that "the more common relief in modern cases is to provide relief *alternative to* dissolution." *Scafidi v. Hille*, 180 So. 3d 634, 652 (¶60) (Miss. 2015) (emphasis added). Like the LLC statutes, corporation law has a statute that declares "Nothing contained in this section shall diminish the inherent equity powers of the court to fashion alternative remedies to judicial dissolution." Miss. Code Ann. § 79-4-14.34(i) (Rev. 2013); *see Boatright v. A & H Techs. Inc.*, 296 So. 3d 687, 701 (¶58) (Miss. 2020) (citing this statute when upholding a chancery court's decision to order 50/50 ownership of a company).

¶44. This caselaw and these statutes perceive that a chancery court may have to untangle a knot that has formed within an LLC or corporation, and the court's ability to do equity is

undiminished. The trial court expressly relied on those powers of equity. While Dawn argues the trial court "erred in finding that [Wendy] was entitled to an award of attorney's fees," there was no such award. The plain face of the order actually states that attorney's fees were not granted, and even if they had been, "no evidence of the amount of attorney fees incurred by Wendy was introduced," which would have placed any such award on shaky ground. Instead, the trial court recognized "that *the equities of the parties are considered balanced* between the parties as to contribution by Wendy for real property taxes on the property of Medecon, LLC, for tax years 2018, 2019 and 2020, and as to Wendy's entitlement to an award of attorney fees." (Emphasis added).

¶45. In other words, to the extent Wendy had been harmed by the need to sue Dawn to open a bank account or for the taxes she paid on money not received, any such harm was evened out by the 50% offset for property taxes granted to her. This is a classic situation where a chancery court found that one party had suffered a wrong and fashioned a remedy, and the decision was not an abuse of discretion.

¶46. Next, Dawn argues that "Mississippi law does not require a limited liability company to enter into a written operating agreement." She is generally correct because when an LLC's "certificate of formation or operating agreement does not otherwise provide for a matter" such as the activities of the company and what it chooses to do, the general LLC law acts as a gap-filler. *See* Miss. Code Ann. § 79-29-123(2) (Supp. 2015) (setting out that "this chapter governs the matter" in the absence of a written agreement).

¶47. The trial court explained in its opinion exactly why requiring these two members of

14

an LLC to draft an operating agreement was important. The two members, who remained sisters-in-law, had allowed their relationship to deteriorate to the point they had not spoken face to face in nearly ten years and communicated only through lawyers, a CPA, and email. Even though all that stood in the way of them splitting a disbursement from nearly $100,000 in rent checks to Medecon was a simple bank account, which they both said they wanted, they refused to cooperate long enough to open one. This rift between them halted Medecon from its full operation as an LLC, and an operating agreement could settle any tensions that might arise in the future. An operating agreement would ratify and codify their sworn testimony at trial that the one purpose of Medecon was to rent out the property at 102 Upton Drive and pre-empt any future conflict on that point. This decision was within the discretion afforded to the trial court.

¶48. "[I]t is the responsibility of the chancellor to weigh the credibility of the witnesses and balance the equities of the parties." *Varnell v. Rogers*, 198 So. 3d 1278, 1283 (¶14) (Miss. Ct. App. 2016). We find the trial court did just that in this case.

## CONCLUSION

¶49. Because it was within the discretion of the trial court to deny the request to dissolve the LLC, to grant an offset for property taxes, and to require Medecon's two members to draft and sign an operating agreement, the trial court's ruling is affirmed.

¶50. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**